UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:14-cv-22079-UU



FILED by _AP_ D.C.

JAN 2 6 2015

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA, *ex rel.*
JAMES A. BURKS, M.D., and JAMES D.
DAVENPORT, M.D.,

               Plaintiffs/Relators,

v.

JOHN R. DYLEWSKI, M.D., BAPTIST
HEALTH SOUTH FLORIDA, INC. d/b/a
BAPTIST HEALTH SOUTH FLORIDA, and
d/b/a MIAMI CARDIAC & VASCULAR
INSTITUTE; BAPTIST HOSPITAL OF
MIAMI, INC.; and SOUTH MIAMI
HOSPITAL, INC., d/b/a SOUTH MIAMI
HEART CENTER,

               Defendants.

_____/

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)

---

AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF
UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3730), and
UNDER THE STARK LAW (42 U.S.C. § 1395nn)

---

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131 ☎ 305.372.2772 📠 305.397.1886 🖥 www.aronovitzlaw.com

**NATURE OF THE CASE**

1.      Since at least 2007, thousands of patients who have been treated by JOHN R. DYLEWSKI, M.D., with the consent of his employer, BAPTIST HEALTH SOUTH FLORIDA, INC. d/b/a BAPTIST HEALTH SOUTH FLORIDA, and d/b/a MIAMI CARDIAC & VASCULAR INSTITUTE; BAPTIST HOSPITAL OF MIAMI, INC.; and SOUTH MIAMI HOSPITAL, INC. d/b/a SOUTH MIAMI HEART CENTER, have been subjected to invasive, improper, unjustified, medically unnecessary, repetitive, high risk and costly medical procedures that were undertaken to treat cardiac arrhythmias. Many of the patients were elderly and Defendants have intentionally subjected these patients to multiple unnecessary procedures, many more than were clinically indicated.  Defendants knowingly submitted false claims to Medicare and other federally-funded health care programs for these improper and unnecessary medical procedures.  At all relevant times, the conduct alleged herein was initiated and known throughout BAPTIST's and SOUTH MIAMI's highest corporate hierarchy, including their Chief Operating and Chief Executive Officers, department officers, chiefs of various medical divisions, and members of various peer review committees.  Defendants have knowingly perpetuated a fraud upon the United States and injured vulnerable patients in the process.

2.      The Defendants also engaged in an illegal referral scheme in violation of the Stark Law, 42 U.S.C. § 1395nn, as a result of Defendant, Dr. JOHN R. DYLEWSKI securing a Ten Million Dollar donation from his patient, L. Austin Weeks, which is the largest individual donation ever received by Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC., BAPTIST HOSPITAL OF MIAMI, INC., and/or SOUTH MIAMI HOSPITAL, INC. As of result of Defendant, Dr. DYLEWSKI's efforts, a fund was created to equip a state of the art electrophysiology clinic with new angiography equipment as well as an outpatient cardiac

1

rhythm management clinic for the diagnosis and management of heart rhythm problems located at Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC., and SOUTH MIAMI HOSPITAL, INC. Defendant, Dr. DYLEWSKI was induced to obtain the donation, or rewarded for obtaining the donation, by Defendants, BAPTIST HEALTH SOUTH FLORIDA, BAPTIST HOSPITAL OF MIAMI, INC., and SOUTH MIAMI HOSPITAL, INC., and, as a result, was promptly appointed as the Medical Director of the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology and was paid a substantial annual salary for serving in said position. Defendant, Dr. DYLEWSKI did not perform any identifiable  services nor did he perform any special medical services for the financial remuneration that he received annually for his services as Medical Director.

3.      Since the establishment of the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology, the Defendants have violated the Stark Law, 42 U.S.C. § 1395nn, by seeking Medicare reimbursement for treatment of patients referred by Defendant, Dr. DYLEWSKI, a doctor to whom Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC., BAPTIST HOSPITAL OF MIAMI, INC., and SOUTH MIAMI HOSPITAL, INC., have given benefits, and then falsely certified to the government in hospital cost reports that the services were provided in compliance with all applicable laws, including the Stark Law.

4.      Relators, JAMES A. BURKS, M.D. and JAMES D. DAVENPORT, M.D., bring this action on behalf of the United States, pursuant to the federal False Claims Act ("FCA") and the Stark Law, to recover those funds that the Defendants have improperly obtained and retained as a result of this fraud.

5.      Relator, JAMES D. DAVENPORT, has witnessed the Medicare fraud and Defendants' predatory surgical practices during his employment at Defendant, JOHN R.

2

DYLEWSKI, M.D.'s medical office during 2006 to 2007, and then in his capacity as a practicing physician for Defendant, BAPTIST HEALTH SOUTH FLORIDA, INC., and while primarily practicing at Defendant, SOUTH MIAMI HOSPITAL, INC. d/b/a South Miami Heart Center, Relator, JAMES A. BURKS, M.D., as a member of the South Miami Heart Center Advisory Board and in his capacity as Chief of the Cardiovascular Clinical Service Line at the South Miami Heart Center has also witnessed repeated and continuing instances of these improper and predatory medical practices.  Moreover, multiple other physicians and staff have complained both verbally and in writing to the administration of Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC., BAPTIST HOSPITAL OF MIAMI, INC., and Defendant, SOUTH MIAMI HOSPITAL, INC., about Defendant, JOHN R. DYLEWSKI, M.D.'s unethical procedures, disregard for Medicare regulations and, more importantly, the health and welfare of vulnerable patients. These complaints fell on deaf ears and the administration at Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC., BAPTIST HOSPITAL OF MIAMI, INC., and SOUTH MIAMI HOSPITAL, INC., failed to take any action to protect these patients.

6.     Defendant, JOHN R. DYLEWSKI, M.D., during the course and scope of his employment with Defendants, engaged in a pattern of unnecessarily performing a variety of surgical and invasive procedures including, among others, electrophysiology studies, atrioventricular optimizations, placement and replacement of pacemakers, implantable cardioverter defibrillators, and automatic implantable cardioverter defibrillators, syncopes, and atrial fibrillation/pulmonary vein ablations.  Moreover, although Defendant Dr. DYLEWSKI is not a member of the panel authorized to read and/or interpret echocardiograms, he routinely would bill for them, read and/or interpret them himself so that he could then falsify the results of the echocardiogram,  in order to perform and bill additional unnecessary procedures.  The sole

3

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131 📞 305.372.2772 📠 305.397.1886 🖥 www.aronovitzlaw.com

purpose of this practice of performing multiple procedures where, at best,[1] only one procedure was clinically indicated was to submit additional bills to Medicare for these additional procedures.   Relators and other physicians who have worked with Defendants over the past several years have confirmed a consistent pattern of fraud in Defendants' providing of surgical care, including, but not limited to, (1) ordering and performing suboptimal medical procedures which fail to completely repair the medical issue(s) presented, (2) intentionally requiring the patient to undergo multiple surgical and medical procedures, in order to (3) inflate the surgical and medical fees and reimbursements, along with the related hospital and anesthesiology fees and reimbursements by the federal government. These wrongful practices commenced in at least 2007 and continue through this date.

7.      Significantly, Defendants' pattern of requiring patients, many of whom are elderly, to undergo multiple surgical procedures unnecessarily, placed the patients at great risk of complications including infections, heart perforations, and death because of the risks associated with these serious cardiac procedures and also related to undergoing general anesthesia.

8.      Relators have repeatedly complained to the administration at Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC., BAPTIST HOSPITAL OF MIAMI, INC., and SOUTH MIAMI HOSPITAL, INC., that many of the procedures performed by Defendant, JOHN R. DYLEWSKI, M.D., had been found by the Peer Review Committee at the South Miami Heart Center to not be medically indicated and had been performed based on fabricated and/or fraudulently interpreted studies and clinical documentation.    Specifically, Relators complained that patients were undergoing excessive, unnecessary, and improper procedures solely for the purpose of billing Medicare.  When notified of Peer Review Committee complaints

---

[1] As explained more fully below, Defendant Dr. DYLEWSKI has performed procedures where **_none_** was clinically or medically indicated or needed by the patient.

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131 ☏ 305.372.2772 🖷 305.397.1886 ⌨ www.aronovitzlaw.com

about the improper conduct of Defendant, Dr. DYLEWSKI, Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC., BAPTIST HOSPITAL OF MIAMI, INC., and SOUTH MIAMI HOSPITAL, INC., argued with the reporting physicians and defended the actions of Defendant, Dr. DYLEWSKI stating that he is an important medical producer at the hospitals.

9.      Despite direct knowledge of Defendant, JOHN R. DYLEWSKI, M.D.'s unethical and fraudulent conduct, Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC., BAPTIST HOSPITAL OF MIAMI, INC., and SOUTH MIAMI HOSPITAL, INC., have taken little or no action.  Defendants have failed to notify either the affected patients or Medicare.  Instead of making the required refunds to the federal government for these false claims, Defendants have concealed the overpayments that resulted from their scheme and enjoyed the profits and benefits of their fraudulent conduct.

10.      Moreover, instead of making the necessary systemic changes to avoid such pervasive fraud in the future, Defendants have simply continued to bill Medicare and other government agencies for excessive, unnecessary, and improper cardiac electrophysiology procedures and have falsely certified the medical necessity and appropriateness of those claims.

11.      Defendants have also repeatedly and falsely certified that they are in compliance with the regulatory conditions of participation in the Medicare program including the Stark Law, when they know that they are not in compliance, thereby knowingly submitting additional false claims to Medicare.

12.      Accordingly, Defendants have violated federal law as they have:  (a) submitted claims to Medicare and other government programs for medical procedures which they had reason to know were medically unnecessary, were being performed improperly, were excessive, were incompatible with standards of accepted medical practice, and were of no medical value;

5

(b) falsely certified their compliance with the conditions of participation in the Medicare program including the Stark Law when they knew that they were not in compliance with such prerequisites; and (c) failed to return to the federal government such payments that they were not entitled to receive and that they knew they were not entitled to retain.

13.     The end result of these false claims is the unjustified and illegal enrichment of Defendants, and the corresponding misappropriation and loss of millions, and potentially tens of millions, of taxpayer funds.

14.     On behalf of the United States, Relators seek to recover these damages as well as civil penalties arising from the false claims and violations of the Stark Law that Defendants caused to be submitted to the United States, as well as money damages for the wrongful retention of overpayments and refunds that are due and payable to the United States.

## JURISDICTION AND VENUE

15.     This action is brought under the *qui tam* provisions of the United States False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA").  The FCA provides, *inter alia*, that any person who knowingly submits a false or fraudulent claim to the federal government for payment or approval is liable to the federal government for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each claim, plus three times the amount of the false claim.  31 U.S.C. § 3729(a).

16.     This action is brought under the provisions of the Stark Law, 42 U.S.C. § 1395nn(g), which imposes liability requiring a refund of payments received for the services provided to the improperly referred patients, along with civil monetary penalties of up to $15,000 for each violation, and up to $100,000 for each agreement between the parties constituting a prohibited financial relationship.

6

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131 ☎ 305.372.2772 🖷 305.397.1886 💻 www.aronovitzlaw.com

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and pursuant to 31 U.S.C. § 3730(b).

18.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC., BAPTIST HOSPITAL OF MIAMI, INC., and SOUTH MIAMI HOSPITAL, INC. are located in and conduct business in this District, and Defendant, JOHN R. DYLEWSKI, M.D. conducts business in this District.  Moreover, most if not all of the acts proscribed by 31 U.S.C. § 3729 and 42 U.S.C. § 1395nn that are alleged in this Complaint occurred in this District and Defendants can be found, reside, or transact business in this District.

19.     Venue lies within the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b) and (c) , 31 U.S.C. § 3732(a), and 42 U.S.C. § 1395nn, because the acts and practices alleged in this Complaint occurred in this District and all of the Defendants can be found, reside, or transact business in this District.

## THE PARTIES

### I.     The Relators

20.     Under the FCA, a person with knowledge of false or fraudulent claims against the Government (a "Relator") may bring an action on behalf of the federal government and herself/himself.

21.     Relator, JAMES A. BURKS, M.D., is a citizen and resident of Miami, Florida. Dr. BURKS earned his undergraduate degree from Carnegie Mellon University; he then completed his medical education at New York University School of Medicine, and earned his post-doctoral Master's in Business Administration from the University of Miami.  He is a board certified vascular surgeon and medical doctor licensed to practice in Florida, as well as

7

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131 ☎ 305.372.2772 ☒ 305.397.1886 ⌨ www.aronovitzlaw.com

California.  Dr. BURKS was selected for a two year fellowship in vascular and endovascular surgery at Mount Sinai Medical Center in New York commencing in 2000.  After completing his fellowship in 2002, Dr. BURKS was in practice as a vascular surgeon at St Luke's-Roosevelt Hospital Center in New York, and an Assistant Professor of Surgery at Columbia University in New York until 2003, when he began his practice as vascular surgeon at Defendant, SOUTH MIAMI HOSPITAL.  Dr. BURKS has been Chief of Vascular Surgery at SOUTH MIAMI HOSPITAL since 2009, and since 2003 has been an active member of various peer review committees at SOUTH MIAMI HOSPITAL including the Peripheral Vascular Quality Assurance Committee at South Miami Hospital; the South Miami Hospital Credentials Committee; Chairman, Peripheral Vascular Interventions Credentials Committee at South Miami Heart Center; South Miami Heart Center Executive Committee; South Miami Heart Center Advisory Board; and Chief of Cardiovascular Clinical Service Line at South Miami Hospital.  Since 2010, Dr. BURKS has also served as a Voluntary Assistant Professor of Surgery at Florida International University.

   22.   Relator, JAMES D. DAVENPORT, M.D., is a citizen and resident of Miami, Florida.  Dr. DAVENPORT earned his undergraduate degree from Penn State University; he then completed his medical education at Hahnemann University School of Medicine in Philadelphia, Pennsylvania.  He is a board certified cardiologist and medical doctor licensed to practice in Florida.  Dr. DAVENPORT was selected for a two year fellowship in cardiology commencing in 2002, immediately followed by a two year fellowship in Cardiac Electrophysiology both at Drexel University in Philadelphia, Pennsylvania.  After completing his fellowship in Cardiac Electrophysiology in July 2006, Dr. DAVENPORT moved to the South Florida area and began his employment with Defendant, JOHN R. DYLEWSKI at the

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131 ☏ 305.372.2772 ☎ 305.397.1886 ⌨ www.aronovitzlaw.com

Arrhythmia Management Institute of South Florida. Over the last four years, Dr. DAVENPORT has been an active member of various peer review committees at Defendant, SOUTH MIAMI HOSPITAL, including the South Miami Hospital Electrophysiology Committee; South Miami Hospital Bylaws Committee; and the South Miami Heart Center Advisory Executive Committee. Since 2010, Dr. DAVENPORT has also served as a Voluntary Assistant Professor of Cardiology at Florida International University.

23.     During his employment with Defendant, Dr. DYLEWSKI, Relator, Dr. DAVENPORT had daily contact with Defendant Dr. DYLEWSKI where he personally observed Defendant, Dr. DYLEWSKI engage in a consistent pattern of health care fraud involving both government and private insurance fraud. Moreover, both Relators, Dr. DAVENPORT and Dr. BURKS have personal knowledge of Defendant, Dr. DYLEWSKI's practice of intentionally subjecting patients to multiple unnecessary cardiac procedures, and performing excessive and not medically indicated procedures for the sole purpose of increasing the amount of physician and hospital reimbursements paid by Medicare and other federally-funded programs.

24.     All allegations in this Complaint are based on evidence obtained directly by Relators, independently, and through their own labor and efforts. The information and evidence they have obtained or of which they have personal knowledge, and on which these allegations regarding violations of the False Claims Act and the Stark Law are based, consist of their own personal observations, review of documents including medical records and films, conversations with other physicians, staff and employees of Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC., BAPTIST HOSPITAL OF MIAMI, INC., and SOUTH MIAMI HOSPITAL, INC., and knowledge of other actions taken, or not taken, pursuant to policy, practice, or

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131 ☏ 305.372.2772 🖷 305.397.1886 ⌨ www.aronovitzlaw.com

instructions from Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC., BAPTIST HOSPITAL OF MIAMI, INC., and SOUTH MIAMI HOSPITAL, INC.

25.     None of the allegations set forth in this Complaint are based on a public disclosure of information in a criminal, civil, or administrative hearing; in a Congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or from the news media.  Rather, they are the independent declarations of the Relators.

26.     Relators are an original source of information within the meaning of the False Claims Act, 31 U.S.C. § 3730(e)(4)(B).

27.     Prior to the filing of this Complaint, Relators have voluntarily, through their attorneys, made all appropriate disclosures to the federal government, pursuant to 31 U.S.C. § 3730.

28.     The Relators have also complied with the statutory obligation to file this Complaint under seal, without service on Defendants, for 60 days, pursuant to 31 U.S.C. § 3730(b)(2).

**II.     The Defendants and Their Business**

29.     BAPTIST HEALTH SOUTH FLORIDA, INC. ("BAPTIST HEALTH") is a Florida not-for-profit corporation with its principal place of business located in Coral Gables, Florida.   BAPTIST HEALTH employs more than 15,000 employees and more than 2,200 physicians.

30.     BAPTIST HEALTH operates eight hospitals throughout South Florida including Defendants, BAPTIST HOSPITAL OF MIAMI, INC., and SOUTH MIAMI HOSPITAL, INC.

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  📞 305.372.2772  📠 305.397.1886  🖥 www.aronovitzlaw.com

Through its network of medical facilities, BAPTIST HEALTH treats over one million patients annually.[2]

31.     BAPTIST HEALTH is organized and operates exclusively for the benefit of, to perform the functions of, or to carry out the purposes of Defendants, BAPTIST HOSPITAL OF MIAMI, INC., and SOUTH MIAMI HOSPITAL, INC., along with its other hospitals.

32.     BAPTIST HOSPITAL OF MIAMI, INC. ("BAPTIST HOSPITAL"), is a Florida not-for-profit corporation with its principal place of business in Miami, Florida.   BAPTIST HOSPITAL is currently a hospital licensed with 728 beds.   BAPTIST HOSPITAL is a Defendant, BAPTIST HEALTH facility, along with seven others including Defendant, SOUTH MIAMI HOSPITAL, INC., and Doctors Hospital.

33.     SOUTH MIAMI HOSPITAL, INC. ("SMH") is a Florida not-for-profit corporation with its principal place of business located in South Miami, Florida.

34.     SMH is currently a hospital licensed for 452 beds. In addition, it houses the South Miami Heart Center which is a full-service cardiac and vascular care facility providing comprehensive medical services for inpatient, outpatient and emergency services for cardiovascular diseases.   SMH is a Defendant, BAPTIST HEALTH facility, along with seven others including Defendant, BAPTIST HOSPITAL, and Doctors Hospital.

35.     Defendant, JOHN R. DYLEWSKI, is sued as the agent and/or employee of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, acting within the course and scope of said agency and/or employment, with the knowledge and/or consent of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH.   All of the allegations against Defendant, Dr. DYLEWSKI stated herein are related to conduct that occurred while he was an

---

[2] *See* https://baptisthealth.net/en/about-baptist-health/pages/default.aspx.

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131 ☎ 305.372.2772 🖷 305.397.1886 🖳 www.aronovitzlaw.com

employee and/or agent of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, and while he was acting within the course and scope of his employment and/or agency at BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH.   BAPTIST HEALTH, BAPTIST HOSPITAL and SMH consented to, participated in, and had full knowledge of the fraudulent conduct of Defendant, Dr. DYLEWSKI at all times material hereto.

## APPLICABLE LAW AND REGULATIONS

**III.    The False Claims Act**

36.    The FCA, as amended, provides in pertinent part that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990…plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

37.    The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

38.    The FCA is the federal government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong. 2d Sess. at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266.

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☏ 305.372.2772  🖷 305.397.1886  🖵 www.aronovitzlaw.com

## IV.     The Stark Law

39.     The Stark Law, 42 U.S.C. § 1395nn, prohibits a doctor from referring Medicare patients to a hospital if the doctor has certain specified types of "financial relationships" with that hospital.  *See* 42 U.S.C. § 1395nn(a)(1)(A).  Moreover, the Stark Law prohibits that same hospital from presenting claims for payment to Medicare for any medical services it rendered to such referred patients. *See* 42 U.S.C. § 1395nn(a)(1)(B).

40.     The Stark Law broadly defines "financial relationships," and the statute contains numerous exceptions to that definition. *See id.* § 1395nn(a)(2), and (b)-(e).  However, where such a Stark-defined "financial relationship" exists, as it does here between Defendant Dr. DYLEWSKI and Defendants, BAPTIST HEALTH, and/or BAPTIST HOSPITAL, and/or SMH, a doctor "may not make a referral to the [hospital]," and the hospital "may not present or cause to be present[ed] a [Medicare] claim." *See id.* § 1395nn(a)(1).

41.     One of the exceptions to the Stark-defined "financial relationships" is a bona fide employment relationship.  In relevant part, the statute states:

(2)     Bona fide employment relationships

Any amount paid by an employer to a physician (or an immediate family member of such physician) who has a bona fide employment relationship with the employer for the provision of services if--

(A)     the employment is for identifiable services,

(B)     the amount of the remuneration under the employment—

    (i) is consistent with the fair market value of the services, and
    (ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician,

(C)     the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer,

13

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☎ 305.372.2772  📠 305.397.1886  🖥 www.aronovitzlaw.com

Violation of the statute requires the refund of any amounts collected in violation of subsection (a)(1), in addition to civil monetary penalties. *See id.* § 1395nn(g).

**V.    Cost Reporting and Claims Processing Procedures Under The Medicare Program**

42.    In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426-1.

43.    Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

44.    CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

45.    There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them. 42 U.S.C. §§ 1395j-1395w-5. The allegations herein involve both Parts A and B for services billed by the Defendants to Medicare.

14

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131 ☏ 305.372.2772 🖷 305.397.1886 🖳 www.aronovitzlaw.com

46.     Under Medicare Part A, hospitals enter into an agreement with Medicare to provide health care items and services to treat Medicare patients.  The hospital, also called a "provider," is authorized to bill Medicare for that treatment. Most hospitals, including the Defendant's hospitals, derive a substantial portion of their revenue from the Medicare Program.

47.     At all times material hereto, the Medicare program was administered by individual states, including Florida, through private insurance carriers.  These carriers contracted with the Department of Health and Human Services and served as fiscal intermediaries to receive, adjudicate, and pay Medicare claims submitted to it by Medicare beneficiaries, physicians, or providers of services.

48.     In order to get paid, a hospital completes and submits a claim for payment on a designated claim form, which, during the relevant time period, was or has been designated either as a Form UB-4 (also known as a CMS-1450) or a Form UB-92.  This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient.  The Medicare Program relies upon the accuracy and truthfulness of the UB-4/UB-92 to determine whether and what amounts the hospital is owed.

49.     In addition, at the end of each fiscal year, CMS requires hospitals to submit a Form 2552, more commonly known as the Hospital Cost Report, to the fiscal intermediary.  The Hospital Cost Report contains information on facility characteristics, utilization data, costs, Medicare settlement data, financial statement data, and cost and charges by cost center.   42 C.F.R. § 413.20(b), 42 U.S.C. § 1395g.

50.     While Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-4s/UB-92s) during the course of the fiscal year, this Medicare liability for inpatient services is

15

then totaled with any other Medicare liabilities to the provider and is reported on the annual Hospital Cost Report. This total determines Medicare's liability for services rendered to Medicare beneficiaries during the course of fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due to either the Medicare Program or the provider.

51.     Medicare relies on the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than the provider has already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60, and 413.64(0)(1).

52.     A key purpose of the Hospital Cost Reports is to protect the federal government from loss due to mistake or fraud. Medicare has the right to audit Hospital Cost Reports and financial representations made by program participants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. However, while Hospital Cost Reports are potentially subject to audit review, it is generally known throughout the health care industry that fiscal intermediaries do not have sufficient resources to perform in-depth audits on the majority of Hospital Cost Reports submitted to them. It is also generally known through the health care industry that two to three years will elapse from the time Hospital Cost Reports are filed until they are finalized. For these reasons, the cost reporting system relies substantially on the good faith of providers to prepare and file accurate Hospital Cost Reports.

53.     To this end, the Hospital Cost Report, Form 2552, contains the following warning:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT

16

UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

That advisory is then followed by the following "Certification," which must be signed by the chief administrator of the provider or a responsible designee of the administrator:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

54.     Under Medicare Part B, physicians, like Dr. DYLEWSKI, must enroll with Medicare to be eligible for payment of covered medical services provided to treat patients who are beneficiaries under the Medicare program. The physician is authorized to bill Medicare for that treatment. Many physicians, like Dr. DYLEWSKI, derive a substantial portion of their revenue from the Medicare Program. In this case, the revenue is derived for the benefit of his employer and/or his agency, Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL and/or SMH, which, in turn, pay Dr. DYLEWSKI a substantial salary and benefits based upon performance and revenue generated from his billings.

55.     In order to get paid from Medicare, providers, like Defendants herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131 ☏ 305.372.2772   ⊟ 305.397.1886  ⌨ www.aronovitzlaw.com

relevant time period, was or has been designated CMS 1500. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

56. To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

57. That certification is then followed by the following "Notice:"

> Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## VI. Conditions of Participation and Conditions of Payment

58. To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

### A. Medical Necessity and Appropriateness Requirements

59. One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and

ARONOVITZ LAW
One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131 ☏ 305.372.2772 🖷 305.397.1886 🖳 www.aronovitzlaw.com

accurate information.  42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

60.     Various claims forms, including but not limited to the Hospital Cost Report and the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations.  42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406.  Providers must also certify that the information submitted is correct and supported by documentation and treatment records.  *Id. See also*, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

61.     The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

**B.     Obligation to Refund Overpayments**

62.     As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports).  42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. *See also* 42 C.F.R. §§ 489.40, 489.31.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.  Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments.  42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

63.     Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.   42 U.S.C.

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☎ 305.372.2772   🖶 305.397.1886  🖥 www.aronovitzlaw.com

§ 1395u(*l*)(3).  In such cases, the overpayment is subject to recoupment.  42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments.  42 U.S.C. § 1395*l*(j).

64.     Similarly, refunds are also required where payments were improperly made in violation of the Stark Law.  42 U.S.C. § 1395nn(g).

### C.     Peer Review and Quality Assessment Obligations

65.     Another important requirement for a hospital that wishes to participate in the Medicare Program is that the hospital "must have an organized medical staff that operates under bylaws approved by the governing body and is responsible for the quality of medical care provided to patients by the hospital."  42 C.F.R. § 482.22. Hospitals must "develop, implement, and maintain an effective, ongoing, hospital-wide, data-driven quality assessment and performance improvement ['QAPI'] program."  42 C.F.R. § 482.21.

66.     As part of its QAPI program, a hospital "must set priorities for its performance improvement activities that (i) focus on high-risk, high-volume, or problem-prone areas; (ii) consider the incidence, prevalence, and severity of problems in those areas; and (iii) affect health outcomes, patient safety, and quality of care."  *Id.* § 482.21(c)(1).

67.     Finally, a hospital "must track medical errors and adverse patient events, analyze their causes, and implement preventive actions and mechanisms[.]"  *Id.* § 482.21(c)(2).

### VII.     Other Federally-Funded Health Care Programs

68.     Although false claims to Medicare are the primary FCA violations at issue in this case, the patients who were subjected to the medically unnecessary procedures that are the subject of this action were beneficiaries of one of three federally-funded health care benefit programs – Medicare, Medicaid, or TRICARE/CHAMPUS.   Accordingly, those other two programs are briefly discussed as well.

20

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☏ 305.372.2772  🖷 305.397.1886  🖳 www.aronovitzlaw.com

69.     The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.*, is a system of medical assistance for indigent individuals.  CMS administers Medicaid on the federal level, and reimbursement of hospital costs or charges is governed by Part A of Medicare, through the hospital cost report system, and reimbursement of physician charges is governed by Part B of Medicare. As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of *appropriate* and *necessary* care to Medicaid beneficiaries.

70.     TRICARE, formerly known as CHAMPUS, is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, *et seq.*).  Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).  And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records.   32 C.F.R. §§ 199.9(b)(3)-(b)(5).

21

71.     The process for billing and receiving payment from Medicare is that after a procedure is performed or a service is provided that gives rise to a potential reimbursement by Medicare, Defendants first assign a Medical Claim Number ("MCN") to the procedure.

72.     Next, a claim for payment is submitted to the fiscal intermediary, and a designated claim form, either a Form UB-4 or Form UB-92, is created.  This form contains the patient-specific information, including the diagnosis and the type of services that were provided to the Medicare beneficiary.

73.     As a matter of course, the Form UB-4 or Form UB-92, and a CMS 1500 for the physician services, are typically submitted to the appropriate fiscal intermediary within a few business days after the medical service was provided but, in accordance with CMS regulations, in no event more than 120 days later.

74.     Defendants submit claims for all goods and services that are provided to patients who are beneficiaries of federally-funded health care programs.

## APPLICABLE MEDICINE

75.     The allegations of false claims herein involve a variety of cardiac procedures associated with cardiac electrophysiology.  Relators, Dr. BURKS and Dr. DAVENPORT have personal knowledge of the fraudulent conduct related to unnecessary multiple procedures and improper performance of surgical procedures.  Therefore, we will briefly describe the area of medical specialty and some examples of the fraudulent conduct related to both.

76.     Cardiac electrophysiology is a branch of cardiology involved with the treatment of electrical conduction disturbances of the heart.  These disturbances are called arrhythmias (abnormal heart rhythms) and can lead to loss of consciousness (syncope), congestive heart failure (shortness of breath, lack of energy), palpitations, fatigue, or even sudden death.

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☏ 305.372.2772  ☐ 305.397.1886  ☐ www.aronovitzlaw.com

Arrhythmias can be caused by various medical conditions including coronary artery disease; high blood pressure; changes in the heart muscle (cardiomyopathy); valve disorders; electrolyte imbalances in the blood, such as sodium or potassium; injury from a heart attack; and as a result of the healing process after heart surgery.  Arrhythmias can also be caused by certain substances or medications, such as caffeine, nicotine, alcohol, cocaine, inhaled aerosols, diet pills, and cough and cold remedies.  Emotional states such as shock, fright or stress can also cause irregular heart rhythms.  These electrical conduction disturbances can often be treated with medication but frequently diagnosis of and treatment of arrhythmia requires invasive measures if clinically indicated.

77.     Central to the practice of electrophysiology is an examination referred to as an echocardiogram (ECHO) which is a noninvasive ultrasound based diagnostic study which is used to identify structural, valvular and wall motion abnormalities of the heart.  It is frequently used to calculate the ejection fraction of the heart which is a measure of the heart's pumping ability.  Specifically, ejection fraction ("EF") is a measurement usually expressed as a percentage of blood leaving the heart each time it contracts.  During each heartbeat cycle, the heart contracts and relaxes. When the heart contracts, it ejects blood from the two pumping chambers: the right and left ventricles. A normal heart pumps a little more than half of the heart's blood volume with each beat with LVEF ranges from 55-70%.

78.     At all times material hereto, Defendant Dr. Dylewski was not on the panel of those authorized to read ECHO's at BAPTIST HEALTH, BAPTIST HOSPITAL, or SMH and yet he consistently read the ECHO's of his patients in order to perform medically unnecessary and not clinically indicated procedures and, in turn, fraudulently submit bills for all of these procedures.

ARONOVITZ LAW
One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ✆ 305.372.2772   ⌨ 305.397.1886   🖳 www.aronovitzlaw.com

79.     When someone has a heart attack, the heart muscle can become permanently damaged which is referred to as ischemic cardiomyopathy, and the EF decreases corresponding to the severity of the injury.  There are also less common causes of damage to the heart muscle leading to decreased pumping ability that are often reversible and these are referred to as nonischemic cardiomyopathy.

80.     When the heart muscle is permanently damaged causing a decrease in the EF equal to or less than thirty-five percent (35%) in the setting of clinical heart failure, the patient is at risk for malignant arrhythmias and sudden cardiac death and implantation of an automatic implantable cardioverter defibrillator (AICD) can be indicated to continuously monitor the heart's rhythm and to pace or shock the heart if it stops beating or fibrillates.  This is referred to as sudden cardiac death.

81.     An electrophysiologic study ("EP Study") is indicated to evaluate a patient for a suspected or known arrhythmia.  It is an invasive, provocative test in which catheters are advanced from an artery or vein in the groin into the heart and is done to induce an arrhythmia and to identify the aberrant conduction pathway that is causing it. Because it is an invasive test, an EP Study is recommended when other tests, such as a standard electrocardiogram ("EKG"), Holter monitor, event recorder, stress test, ECHO or angiogram cannot provide enough information to thoroughly evaluate your abnormal heart rhythm.

82.     Treatment of an arrhythmia may be ablative (burning away of the abnormal conduction pathways which have been identified), cryoablation (freezing away the abnormal conduction pathways which have been identified) or with implantation of an electrical device (pacemaker, AICD, Biventricular AICD or Biventricular pacemaker).

24

A R O N O V I T Z   L A W

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☎ 305.372.2772  🖷 305.397.1886  🖵 www.aronovitzlaw.com

83.     An AICD can sense a dangerous arrhythmia and is able to cardiovert (shock via the device) the patient if a malignant arrhythmia is noted or pace the heart if a prolonged, dangerous pause is sensed, or cardiac resynchronization by continuous pacing of the left ventricle from two opposite sites to resynchronize the heart walls of the failing heart by improving the timing of the contraction of the heart walls during each and every heart contraction. These devices are technologically advanced and are some of the most costly device implants used in medicine. The above devices are commonly used in the practice of electrophysiology but have strict criteria pertaining to their use.  While these implanted devices have a limited battery life and need to be replaced on a regular basis when the battery energy consumed, they do not need to removed or replaced in order to update the software. The device is essentially a computer with various storage capacities to alert the physician to battery life and potential issues with device hardware or arrhythmias recorded on the device.

84.     Clinical and/or medical indications for these procedures and the implantation of electrical devices include:

**A.  AICD:**

Left Ventricular EF (LVEF): less than or equal to 35% without reversible causes.

**B.  CARDIAC RESYNCHRONIZATION THERAPY (CRT):**

EF less than or equal to 35% without reversible causes and QRS duration 120ms or greater with left bundle branch block on ECG.

**C.  PACEMAKER:**

Class I:  Any symptomatic bradycardia.  Bradycardia is a slow heart rhythm with a rate below 60 beats per minute.

ARONOVITZ LAW
One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☎ 305.372.2772  🖨 305.397.1886  🖳 www.aronovitzlaw.com

Class II:  Any impressive bradycardia without symptom correlation and/or rhythm

abnormalities associated with high risk of progression.

Class III:  Neither symptomatic or at significant risk for progression.

**D.  DEVICE BATTERY/GENERATOR CHANGE:**

At end of life or replacement interval  - not for a software upgrade.

**E.  EP STUDY:**

Symptomatic arrhythmia unresponsive to medical therapy or patient request to not

take medications

**F.  AV OPTIMIZATION**

Patients with implanted pacemakers/AICD/BiVAICD who are not responding to

pacing therapy procedures can be considered, however, not several times a year

on the same patient. This procedure is of historical relevance in the modern era.

85.    For almost a decade, Defendant, Dr. DYLEWSKI has performed the above listed

procedures despite the lack of the foregoing required clinical or medical indications, all with the

knowledge and consent of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH,

solely for the purpose of submitting false claims for payment by the federal government in order

to increase revenue by many millions of dollars and enjoy the corresponding ill-gotten profits for

the benefit of all of the Defendants.

86.    Other procedures where Relators have witnessed a consistent pattern of fraud by

Defendants include the performing of unnecessary Head Upright Tilt Tests which record your

blood pressure and heart rate on a minute-by-minute basis while the table is tilted in a head-up

position at different levels.

26

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☏ 305.372.2772  🖷 305.397.1886  🖳 www.aronovitzlaw.com



The Head Upright Tilt Test is a lengthy and uncomfortable test for the patient, but lucrative for billing purposes.   Relator, Dr. DAVENPORT has witnessed Defendant, Dr. DYLEWSKI regularly schedule patients, including elderly patients, for unnecessary Head Upright Tilt Tests followed by EP Studies which is highly irregular patient management and not within the standard of care for electrophysiology.

87.     The overutilization of these cardiac electrophisiology procedures results in significantly increased costs to the federal government and significantly increased profits for the offending providers. These reimbursement amounts must be added to the reimbursements made to BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH for anesthesiologists' fees, hospital fees, and other related services billed with each additional procedure billed by Defendants.

## ALLEGATIONS

88.     Defendants BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, have turned a blind eye to the systemic overutilization of medical procedures and improperly inflated billing practices of Defendant Dr. DYLEWSKI which has led to the submission of hundreds, and more likely thousands, numerous false and fraudulent claims to Medicare and other federally-funded health care programs for at least the last seven (7) years.

89.     Throughout this same time period, Defendants have participated in an illegal referral arrangement in violation of the Stark Law commencing from the time of the funding and establishment of the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology at

27

which time Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and/or SMH, as an inducement or as a reward, appointed Defendant, Dr. DYLEWSKI as the Medical Director of said Center with an annual salary of $250,000. The "financial relationship" described herein is in direct violation of the Stark Law. Dr. DYLEWSKI was promptly appointed to serve as Medical Director of the Weeks Heart Rhythm Center and was paid an exorbitant annual compensation. Dr. DYLEWSKI failed to maintain any logs or time records that are commonly maintained by a Medical Director in order to document his time devoted to the Weeks Center.

90.     Defendants submit claims for all goods and services that are provided to patients who are beneficiaries of federally-funded health care programs including:

a)   For years, Dr. DYLEWSKI and/or the BAPTIST HOSPITAL Defendants submitted Hospital Cost Reports (Form 2552) and falsely certified that medical procedures and health care services performed by Dr. DYLEWSKI were medically necessary; and

b)   For years, Dr. DYLEWSKI and/or the BAPTIST HOSPITAL Defendants submitted Health Insurance Claim Forms (Form CMS 1500) and falsely certified that the medical case and services for his patients were medically indicated and necessary.

91.     Relators, Dr. BURKS and Dr. DAVENPORT have personal knowledge, and have reason to know as a result of their daily interaction and duties as physicians at Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, and as members of advisory board and peer review committees evaluating Defendant Dr. DYLEWSKI, as well as their personal involvement with patient care, and conversations with others physicians, nurses, and staff, that millions of dollars in claims were submitted to the federal government for improper,

28

unnecessary, and excessive medical procedures, such as those procedures which are described in more detail in paragraphs 100-111 and in the sections below.

92.   Moreover, as demonstrated by the facts set forth below, Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH have knowledge of the pattern and practice of Defendant Dr. DYLEWSKI performing improper, unnecessary, and excessive medical procedures that were of little to no medical value, incompatible with the standards of acceptable medical care, and therefore not payable by Medicare, Medicaid, or TRICARE/CHAMPUS. At a minimum, each of the Defendants "act[ed] in reckless disregard of the truth or falsity" of the representations about medical necessity that were presented to the federal government, not to mention the reckless disregard for the health, welfare and safety of their patients. These fraudulent practices have taken place for more than a decade.

93.   Relators, Dr. BURKS and Dr. DAVENPORT also have personal knowledge and have reason to know that when widespread and official quality assurance complaints made against Defendant Dr. DYLEWSKI regarding his unethical procedures, failure to follow proper medical indications and protocols, and his suboptimal performance of procedures were investigated by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, no remedial action was taken against Defendant Dr. DYLEWSKI in order to correct this fraudulent conduct. Defendant, Dr. DYLEWSKI has been the subject of reviews and evaluations for quality assurance by the South Miami Heart Center Advisory Board Committee repeatedly for several years related to multiple issues with his performance and improper patient care, including the fact the Defendant, Dr. DYLEWSKI had the highest volume of all of the Electrophysiologists at the South Miami Heart Center.  Ultimately, an ad hoc committee was appointed to specifically review ten (10) randomly selected patient cases handled by Defendant, Dr. DYLEWSKI which

ARONOVITZ LAW
One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☏ 305.372.2772  🖷 305.397.1886  💻 www.aronovitzlaw.com

resulted in a unanimous agreement that patient safety was being compromised and the administration at Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, should suspend Defendant, Dr. DYLEWSKI's privileges until an outside review could be performed. Unbelievably, no affirmative or ameliorative action was taken by the administration of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and/or SMH.

94.     Not only was no remedial action taken by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and/or SMH, but Defendant, Dr. DYLEWSKI was actually rewarded for referring patients and performing excessive, unnecessary and not medically indicated procedures. Relators, Dr. BURKS and Dr. DAVENPORT have personal knowledge and have reason to know that the "financial relationship" between Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and/or SMH and Defendant, Dr. DYLEWSKI is a prohibited financial relationship pursuant to the Stark Law, 42 U.S.C. § 1359nn(a)(1).

95.     Defendant, Dr. DYLEWSKI does not provide any identifiable services in his position as Medical Director of the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology.

96.     The amount of $250,000 paid by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and/or SMH to Defendant, Dr. DYLEWSKI as his annual salary for his position as Medical Director of the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology is not consistent with the fair market value of similar medical director positions nor with the value of the services provided by Dr. DYLEWSKI in his position as Medical Director. DR. DYLEWSKI failed to maintain any logs or time records that are commonly maintained by a Medical Director of a charitable foundation in order to document his time devoted to the Weeks Center annually.

A R O N O V I T Z   L A W

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☏ 305.372.2772  🖷 305.397.1886  🖳 www.aronovitzlaw.com

97.     The fair market value of annual salaries for similar Medical Director positions are in the range of $20,000 to $50,000.  These positions require keeping diligent and accurate logs of all services provided by the medical director, all journals and studies reviewed and studied, provide training and supervision of other physicians and staff, along with other duties and responsibilities.

98.     In addition to the fact that his $250,000 annual salary as Medical Director is at least five times higher than the fair market value of similar Medical Director positions, Defendant, Dr. DYLEWSKI did not provide any identifiable services.

99.     In the meantime, Form UB-4s, Form UB-92s, and CMS 1500 submitted by the Defendants falsely represented that money was owed to Defendants for claims that the Defendants knew were based on unnecessary and improperly performed medical procedures. Those forms also contained knowingly false certifications that Defendants were in compliance with applicable laws and regulations, when in fact Defendants knew they were not in compliance with numerous Medicare program prerequisites, including the duty to maintain an effective peer review program and the fundamental duty to repay any known payments for medically unnecessary procedures.

100.    The truthfulness of those certifications was a prerequisite to receipt of payment from the government for these claims. For years, DR. DYLEWSKI submitted claims to Medicare containing false information that medical procedures that he performed were medically necessary.

101.    As a result of Defendants, BAPTIST HEALTH's, BAPTIST HOSPITAL's, and SMH's inaction, Defendant Dr. DYLEWSKI has been permitted to continue performing medically unnecessary and excessive procedures – for his own financial benefit and to the

31

continued financial benefit of Defendants BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH and to the continued detriment of the federal government and many unsuspecting vulnerable patients.

### Examples of Medically Unnecessary Repetitive or Staged Procedures

102.   Defendant, Dr. DYLEWSKI was motivated to have patients undergo excessive and non-medically indicated procedures in order to meet or exceed his productivity levels as measured by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, and justify his position and corresponding salary.  Defendant, Dr. DYLEWSKI was allowed to continue his performance of unnecessary procedures and related fraudulent billing as a result of the Defendants illegal referral arrangement designed to unjustly enrich the Defendant, Dr. DYLEWSKI in exchange for the millions of dollars donated to Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH from Defendant, Dr. DYLEWSKI's patient to establish and fund the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology. This arrangement between Defendant, Dr. DYLEWSKI and Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH violated the Stark Law, 42 U.S.C. 1395nn.

103.   In furtherance of their scheme, Defendant, Dr. DYLEWSKI is allowed to read patients ECHO's, although he is not on the authorized panel of readers at any of Defendant, BAPTIST HEALTH facilities including Defendants, BAPTIST HOSPITAL or SMH. Defendant, Dr. DYLEWSKI is permitted to do so in order to subsequently prescribe and perform additional invasive procedures which are excessive, medically unnecessary and are not clinically indicated but serve to generate fraudulent bills to Medicare the payments of which are then received and enjoyed by Defendants

32

104.    Additional detail is provided below for select, representative incidents of medically unnecessary procedures, excessive procedures, or procedures which caused serious injury to patients by Defendant Dr. DYLEWSKI.

105.    **Patient No. 1**: As recently as May 2014, an 80 year old female patient underwent three (3) unnecessary procedures before the medically indicated procedure was performed. Specifically, the elderly woman was admitted to Doctors Hospital after two witnessed episodes of fainting – syncope – and was placed on telemetry.  Telemetry revealed a heart block, slow rhythm and bradycardia, indicating a pacemaker was medically necessary as determined by the consulting cardiologist. Nevertheless, Defendant Dr. DYLEWSKI had the elderly patient transferred to Defendant, SMH, and had her undergo a Head Upright Tilt Table Study, a transesophageal echocardiogram, and an electrophysiology study. After undergoing these three (3) unnecessary, excessive and non-medically indicated procedures, Defendant, Dr. DYLEWSKI implanted the pacemaker which was the only procedure that was medically indicated from the outset.

106.    **Patient No. 2**: An 80 year old male patient with multiple comorbidities and chronic kidney disease was treated by Defendant, Dr. DYLEWSKI who "upgraded" his pacemaker to a biventricular pacemaker using excessive amounts of iodinated contrast.  The patient suffered renal failure, dialysis, and eventual death.  A review of pre-procedure medical records failed to reveal any indication for the "upgrade" pacemaker procedure and the patient's ECHO demonstrated an EF greater than 40%.

107.    **Patient No. 3**: Again, Defendant Dr. DYLEWSKI evaluated a 70 year old male patient who presented with multiple comorbidities and chronic kidney disease and recommended and performed a pacemaker "upgrade."  Similar to Patient No. 2 above, the procedure was not

A R O N O V I T Z  L A W
One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☏ 305.372.2772  ☏ 305.397.1886  ☐ www.aronovitzlaw.com

medically indicated and performed unnecessarily and improperly, with the same unfortunate results as Patient 2 above.  These patients underwent these procedures which not only were of no medical value but their deaths were directly and causally related to these unnecessary and improperly performed procedures.   However, as a result of Defendant Dr. DYLEWSKI subjecting Patient No. 2 and No. 3 to general anesthesia and a sham surgical procedure, Defendant Dr. DYLEWSKI submitted bills to Medicare, causing Medicare to also be billed for the anesthesiologist's fees, facility fees and other fees related to the procedure.

108.   **Patient No. 4**: An 85 year old male patient with severe coronary artery disease, peripheral artery disease, and chronic kidney disease presented at Defendant, SMH. Although his prior medical records reflected that he was demented and non-ambulatory, Defendant Dr. DYLEWSKI evaluated this patient and documented him to be in good health and "very active." Defendant, Dr. DYLEWSKI then planned to investigate the patient for syncope although, again, the patient's records reflect that he was unable to get out of bed.  Defendant, Dr. DYLEWSKI also planned an EP study and consulted an interventional cardiologist and requested a cardiac catherization be done prior to the proposed EP study.   The cardiac catherization led to iliac dissection requiring multiple stents, renal failure and the patient's subsequent death.  Defendant, Dr. DYLEWSKI's, workup and proposed EP study had no clinical benefit or medical value for this patient and demonstrates the Defendants reckless disregard for the health, welfare and safety of their patients.

109.   **Patient No. 5**: A 65 year old male patient with congestive heart failure and a previously implanted pacemaker was evaluated by Defendant, Dr. DYLEWSKI.  As a result of Defendant, Dr. DYLEWSKI's evaluation, he replaced the pacemaker with an AICD because allegedly the patient's EF is 25%.  Subsequently, the patient was re-evaluated because the AICD

A R O N O V I T Z  L A W
One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☏ 305.372.2772  🖷 305.397.1886  🖳 www.aronovitzlaw.com

was found to be non-functional for unidentified reasons. Defendant, Dr. DYLEWSKI documented that the device was defective and removed and replaced the AICD and both leads with a new AICD and leads. The removed AICD and leads were returned to the manufacturer for evaluation where it was determined to be completely functional. Upon further review of this patient's records by the ad hoc committee of the South Miami Heart Center Advisory Board, the patient's pre-operative ECHO which had been read by Defendant, Dr. DYLEWSKI showed an EF between 40% to 50% providing no indication for the initial removal of his existing pacemaker and replacement with the AICD. Further, it was determined that any problems with the first AICD was improper lead placement. However, reimbursement for placement of a new device is significantly higher than for lead adjustment and this financial incentive was identified as the reason for the removal and replacement of the AICD.

110. **Patient No. 6**: A 60 year old male patient who allegedly had a low EF, underwent the removal of his pacemaker which was replaced with an AICD performed by Defendant, Dr. DYLEWSKI. The patient was returned to the lab because it was determined that the AICD was not properly capturing the electrical activity. Defendant, Dr. DYLEWSKI documented that the leads were "broken" and the patient required a procedure to remove and replace the leads. The removed leads were returned to the manufacturer for examination and evaluation and were determined to be normal and functional. In addition to the indication that the problem with the leads was improper placement, it is significant that this patient's pre-operative ECHO reflected an EF greater than 40% providing no indication for removal and replacement of his existing device. This was another unnecessary surgery resulting in multiple billings for all of the surgical and related equipment and services for the direct benefit of all Defendants BAPTIST HEALTH, SMH. and Dr. DYLEWSKI.

A R O N O V I T Z   L A W

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☎ 305.372.2772  🖷 305.397.1886  🖳 www.aronovitzlaw.com

111.   **Patient No. 7**:   An 80 year old female patient's medical records reveal no indication for a removal and replacement of her existing pacemaker.   Yet, Defendant, Dr. DYLEWSKI recommended and performed the removal of her existing device and "upgrade" to a biventricular pacemaker.   Immediately following this unnecessary surgery, this patient developed a pericardial effusion due to lead perforation.   Fortunately, her post-operative complications were managed appropriately.

112.   The examples described above are just a small sampling of the medically unnecessary, excessive, and improperly performed procedures and improper fraudulent billing practices implemented by Defendant Dr. DYLEWSKI witnessed and known by Relators Dr. BURKS and Dr. DAVENPORT and that Defendants BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH have endorsed and allowed to continue.   A high percentage, if not all, of Defendant Dr. DYLEWSKI's patients who have undergone these unnecessary procedures are beneficiaries under the Medicare, Medicaid or TRICARE programs. Defendants BAPTIST HEALTH, BAPTIST HOSPITAL, SMH and Dr. DYLEWSKI submitted claims to the federal government for payment for the equipment and medical services related to all of these multiple procedures performed on each of those patients.

113.   Prior to Relators direct and personal knowledge of Defendant DYLEWSKI's pattern and practice of performing medically unnecessary, excessive, and improper procedures and fraudulent billing practices, all of which have been and continue to be sanctioned by Defendants BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, other physicians, nurses, and staff also witnessed these practices.

114.   Specifically, physicians have been vocal to the administration at Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH regarding Defendant Dr. DYLEWSKI's

36

overutilization of AV optimization procedures which have no clinical benefit. Significantly, Defendant, Dr. DYLEWSKI performs AV optimization procedures at Defendant, SMH at a rate that is 5-6 standard deviations above any other hospital in the country. Moreover, the director of the ECHO Department at Defendant, SMH has confirmed that this consistent overutilization is necessary to increase and maintain the volume of laboratory procedures. Again, no action was taken by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and/or SMH to mitigate this overutilization because the volume of procedures allowed them to reaping the benefits of the submission and payment of these fraudulent claims.

115. Moreover, after being advised directly by Relator, Dr. BURKS and other physicians from different medical disciplines who were also members of the various peer review committees about Defendant Dr. DYLEWSKI's fraudulent practices resulting in false claims being submitted to Medicare and other government programs, Defendants BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH failed to inform the federal government about the unnecessary surgical procedures they had discovered, and Defendants BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, failed to refund to the federal government the payments received for such medically unnecessary procedures.

116. Relators, Dr. BURKS and Dr. DAVENPORT have direct knowledge that the administration at both Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH knowingly and willingly allowed Defendant, Dr. DYLEWSKI to continue performing unnecessary, excessive, and improper procedures for their own financial benefit and prevented these and more issues from coming to light by failing to retain an outside reviewer to further investigate Defendant, Dr. DYLEWSKI's systemic and continued fraudulent conduct. Instead,

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☎ 305.372.2772  📠 305.397.1886  🖥 www.aronovitzlaw.com

these Defendants intentionally chose to bury their head in the sand despite the strong and consistent recommendations from the peer review committees and medical staff to the contrary.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A)

117.   The United States re-alleges and incorporates paragraphs 1-116 as if fully set forth herein.

118.   This is a claim for refunds, treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

119.   By means of the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the United States.  The United States, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

120.   By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

### SECOND CAUSE OF ACTION
### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B)

121.   The United States re-alleges and incorporates paragraphs 1-116 as if fully set forth herein.

122.   This is a claim for refunds, treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

123.   By means of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements in support of and material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).  The United States, unaware of the

ARONOVITZ LAW

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☎ 305.372.2772  ☏ 305.397.1886  💻 www.aronovitzlaw.com

falsity of the records and statements, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

124.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

### THIRD CAUSE OF ACTION
### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G)

125.    The United States re-alleges and incorporates paragraphs 1-116 as if fully set forth herein.

126.    This is a claim for refunds, treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

127.    By means of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G).

128.    By virtue of the false or fraudulent statements made to the government and the concealment by Defendants, the United States has been damaged, and continues to be damaged, in a substantial amount.

### FOURTH CAUSE OF ACTION
### VIOLATIONS OF THE STARK LAW, 42 U.S.C. § 1395nn

129.    The United States re-alleges and incorporates paragraphs 1-116 as if fully set forth herein.

130.    This is a claim for refunds and civil penalties under the Stark Law, 42 U.S.C. § 1359nn.

A R O N O V I T Z   L A W

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131  ☏ 305.372.2772  📠 305.397.1886  🖥 www.aronovitzlaw.com

131.   By means of the acts described above, Defendants knowingly entered into prohibited "financial relationships" within the meaning of the Stark Law and Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and/or SMH made payments to Defendant Dr. DYLEWSKI only as inducements or rewards for the funding of the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology, and for patient referrals.

132.   By virtue of the prohibited "financial relationships" between and amongst the Defendants, the United States has been damaged, and continues to be damaged in a substantial amount.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs/Relators pray that upon trial or final hearing, the Court enter a final judgment for Plaintiffs/Relators and the United States against Defendants, as follows:

1.   For the refund or repayment of all amounts that were billed in violation of the FCA, 31 U.S.C. §§ 3729, *et seq.*;

2.   For the refund or repayment of all amounts that were billed in violation of the Stark Law, 42 U.S.C. § 1359nn;

3.   For civil penalties of $5,500 to $11,000 for each false claim pursuant to 31 U.S.C. § 3729(a);

4.   For three times the amount of damages proved, pursuant to 31 U.S.C. § 3729(a);

5.   For civil penalties of not more than $15,000 for each service that was billed in violation of the Stark Law, pursuant to 42 U.S.C. § 1359nn(g)(3);

6.   For a civil penalty of not more than $100,000 for each arrangement entered into by the Defendants in violation of the Stark Law, pursuant to 42 U.S.C. § 1359nn(g)(4);

7.   For costs of court;

8.   For pre-judgment and post-judgment interest at the rates permitted by law;

40

A R O N O V I T Z   L A W

One Biscayne Tower | 2 South Biscayne Blvd. | Suite 2630 | Miami, FL 33131   ☎ 305.372.2772   📠 305.397.1886   💻 www.aronovitzlaw.com

9. For such other and further relief as may be appropriate and authorized by law; and

10. Plaintiffs/Relators further pray that they be awarded an appropriate percentage of the amount recovered by and for the United States as a result of this action, together with statutory expenses, plus reasonable attorneys' fees and costs, in accordance with 31 U.S.C. § 3730(d).

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs/Relators demand a trial by jury of all issues so triable as a matter of

right.

Dated:  January 26, 2015.          Respectfully submitted,

By:_____
Tod Aronovitz (FBN 186430)
ta@aronovitzlaw.com
Barbara Perez (FBN 989304)
bp@aronovitzlaw.com
Andrew Zelmanowitz (FBN 74202)
az@aronovitzlaw.com
**ARONOVITZ LAW**
2 S. Biscayne Boulevard
Suite 2630 – One Biscayne Tower
Miami, FL 33131
305-372-2772 Telephone
305-397-1886 Facsimile

- and –

Spencer Aronfeld (FBN 905161)
aronfeld@aronfeld.com
**ARONFELD TRIAL LAWYERS, P.A.**
3132 Ponce de Leon Boulevard
Coral Gables, Florida  33134
(305) 441-0440 Telephone
(305) 441-0198  Facsimile

*Attorneys for Plaintiffs/Relators*

41

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that on this 26th day of January, 2015, a true and correct copy of the foregoing has been furnished **via e-mail** to Jeffrey W. Dickstein, Esq., (jeffrey.dickstein@usdoj.gov), U.S. Attorney's Office, 99 NE 4th Street, Suite 300, Miami, FL 33132; and to Amy L. Easton, Esq., (Amy.Easton@usdoj.gov), Senior Trial Counsel, United States Department of Justice Civil Division, Fraud Section, 601 D Street N.W. Room 9148, Washington, D.C. 20004.

By: _____

42