UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:14-cv-22079-Ungaro/Otazo-Reyes

UNITED STATES OF AMERICA, *ex rel.*
JAMES A. BURKS, M.D., and JAMES D.
DAVENPORT, M.D.,

                Plaintiffs/Relators,

v.

JOHN R. DYLEWSKI, M.D., BAPTIST
HEALTH SOUTH FLORIDA, INC. d/b/a
BAPTIST HEALTH SOUTH FLORIDA, and
d/b/a MIAMI CARDIAC & VASCULAR
INSTITUTE; BAPTIST HOSPITAL OF
MIAMI, INC.; and SOUTH MIAMI
HOSPITAL, INC., d/b/a SOUTH MIAMI
HEART CENTER,

                Defendants.

_____/

_____

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF
UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3730), and
UNDER THE STARK LAW (42 U.S.C. § 1395nn)

_____

## NATURE OF THE CASE

1.      The False Claims Act was enacted during the U.S. Civil War to encourage private citizens to come forward to report overcharging and fraudulent billing practices directed at any federal government agency. Relators, DR. JAMES BURKS and DR. JAMES DAVENPORT, are two respected and dedicated[1] physicians who observed healthcare fraud perpetrated by the Defendants, JOHN R. DYLEWSKI, M.D., BAPTIST HEALTH SOUTH FLORIDA, INC. d/b/a BAPTIST HEALTH SOUTH FLORIDA, and d/b/a MIAMI CARDIAC & VASCULAR INSTITUTE; BAPTIST HOSPITAL OF MIAMI, INC.; and SOUTH MIAMI HOSPITAL, INC. d/b/a SOUTH MIAMI HEART CENTER,[2] repeatedly reported the fraudulent conduct of Defendant, DR. DYLEWSKI, to multiple administration officials of BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, which reported information was either rejected or ignored. Out of desperation, due to the patient harm, fraudulent billing practices they observed, and the inaction by the HOSPITAL DEFENDANTS, Relators had a choice to make: take their story to

---

[1] Relators are respected physicians as they were selected by their peers to serve on multiple medical boards, Executive Committees, and Ad Hoc medical committees; and are dedicated physicians because they devoted countless hours to the diligent review of a volume of DYLEWSKI patient medical records and billing records as committee members, met with numerous HOSPITAL DEFENDANTS' administration representatives to report DYLEWSKI's fraudulent practices to no avail, and devoted "hundreds of hours" to the detailed review of 130,000 pages of documents produced by the HOSPITAL DEFENDANTS during the 1 ½ years of the government's investigation of this case.

[2] Please Note: The following references and abbreviations will be utilized: Second Amended Complaint for Damages and Other Relief Under the False Claims Act (31 U.S.C. § 3730 and Under the Stark Law 42 U.S.C. § 1395nn) ("SAC"); JOHN R. DYLEWSKI, M.D. ("DYLEWSKI"); AND BAPTIST HEALTH SOUTH FLORIDA, INC. d/b/a BAPTIST HEALTH SOUTH FLORIDA, and d/b/a MIAMI CARDIAC & VASCULAR INSTITUTE ("BAPTIST HEALTH" or "HOSPITAL DEFENDANTS"), BAPTIST HOSPITAL OF MIAMI, INC. ("BAPTIST HOSPITAL or HOSPITAL DEFENDANTS"), and SOUTH MIAMI HOSPITAL, INC. D/B/A SOUTH MIAMI HEART CENTER ("SMH" or "HOSPITAL DEFENDANTS").

the press or seek judicial recourse.  They chose to seek recourse and enforcement by a U.S. District Court Judge.

2.  Since at least 2007, thousands of patients who have been treated by DYLEWSKI, M.D., with the consent of his employers, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH, have been subjected to invasive, improper, unjustified, medically unnecessary, repetitive, high risk and costly medical procedures that were undertaken to allegedly treat cardiac arrhythmias. Most of the patients were elderly and Defendants have intentionally subjected these patients to unnecessary procedures that were not clinically indicated.  Defendants knowingly submitted false claims to Medicare and other federally-funded health care programs for these fraudulent and unnecessary medical procedures.  At all relevant times, the conduct alleged herein was initiated and known throughout the HOSPITAL DEFENDANTS' highest corporate hierarchy, including their Chief Operating and Chief Executive Officers, department officers, chiefs of various medical divisions, and members of various peer review committees.  Defendants have knowingly perpetuated a fraud upon the United States and injured vulnerable patients in the process.

3.  DYLEWSKI and the HOSPITAL DEFENDANTS also engaged in an illegal referral scheme in violation of the Stark Law, 42 U.S.C. § 1395nn *et seq.*, as a result of Defendant, DYLEWSKI securing a Ten Million Dollar donation from his patient, L. Austin Weeks, which was the largest individual donation ever received by the HOSPITAL DEFENDANTS. As a result of Defendant, Dr. DYLEWSKI's efforts, a fund was created to equip a state of the art electrophysiology clinic with new angiography equipment as well as an outpatient cardiac rhythm management clinic for the diagnosis and management of heart rhythm problems located at SMH.  Defendant, DYLEWSKI was induced to obtain the donation, or

rewarded for obtaining the donation, by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH,  and, as a result, was promptly appointed as the Medical Director of the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology and was paid a substantial annual salary for serving in said position. Defendant, DYLEWSKI did not perform any identifiable services nor did he perform any special medical services for the large financial remuneration that he received annually for his services as Medical Director.

4.      Since the establishment of the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology, the Defendants have violated the Stark Law, 42 U.S.C. § 1395nn *et seq.*, by submitting Medicare claims for designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referrals from  Defendant, DYLEWSKI, a doctor having a financial relationship, as defined in the statute, with Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, which have provided DYLEWSKI financial benefits, and then falsely certified to the government in hospital cost reports that the services were provided in compliance with all applicable laws, including the Stark Law.

5.      Relators, JAMES A. BURKS, M.D. and JAMES D. DAVENPORT, M.D., bring this action on behalf of the United States, pursuant to the federal False Claims Act ("FCA"), for violations of the FCA and the Stark Law, to recover those funds that the Defendants have improperly obtained and retained as a result of this fraud.

6.      Relator, JAMES D. DAVENPORT, has witnessed the Medicare fraud and Defendants' predatory surgical practices during his employment as a medical partner with Defendant, DYLEWSKI, during 2006 to 2007, and then in his capacity as a practicing physician for Defendants, BAPTIST HEALTH and BAPTIST HOSPITAL, and while primarily practicing at Defendant, SMH.  Relator, JAMES A. BURKS, M.D., as a member of the South Miami Heart

Center Advisory Board and in his capacity as Chief of the Cardiovascular Clinical Service Line at the South Miami Heart Center has also witnessed repeated and continuing instances of these improper and predatory medical and billing practices.  Moreover, multiple other physicians and staff have complained both verbally and in writing to the administration of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and Defendant, SMH, about Defendant, DYLEWSKI's unethical procedures, disregard for Medicare regulations, fraudulent billing practices and, more importantly, the health and welfare of vulnerable patients. These complaints fell on deaf ears and the administration at Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH, failed to take any action to stop the fraudulent practices and protect these patients.

7.     Defendant, DYLEWSKI, during the course and scope of his employment with Defendants, engaged in a pattern of unnecessarily performing a variety of surgical and invasive arrhythmia procedures including, among others, electrophysiology studies, atrioventricular optimizations, placement and replacement of pacemakers, implantable cardioverter defibrillators, and automatic implantable cardioverter defibrillators, syncopes, and atrial fibrillation/pulmonary vein ablations.  Moreover, although Defendant DYLEWSKI is not a member of the panel authorized to read and/or interpret echocardiograms, he routinely would bill for them, and read and/or interpret them himself so that he could then falsify the results of the echocardiogram, and perform and bill additional unnecessary procedures.  The sole purpose of this practice of performing multiple procedures where, at best,[3] only one procedure was clinically indicated was to submit fraudulent bills to Medicare for these additional procedures.  Relators and other physicians who have worked with Defendants over the past several years have confirmed a

---

[3] As explained more fully below, Defendant Dr. DYLEWSKI has performed procedures where ***none*** was clinically or medically indicated or needed by the patient.

consistent pattern of fraud in DYLEWSKI's surgical practices, including, but not limited to, (1) ordering and performing arrhythmia medical procedures which were not medically necessary or clinically indicated, (2) intentionally requiring the patient to undergo multiple arrhythmia medical procedures in order to inflate the surgical and medical fees and reimbursements, along with the related hospital and anesthesiology fees and reimbursements, and (3) falsifying medical charts to substantiate the need for a procedure, all done in order to secure reimbursements by the federal government. These wrongful practices commenced in at least 2007 and continue through this date.[4]

8.      Significantly, Defendants' pattern of requiring patients, many of whom were elderly, to undergo multiple medical procedures unnecessarily, placed the patients at great risk of complications including infections, heart perforations, and death because of the risks associated with these serious cardiac procedures and also related to undergoing general anesthesia.

9.      Relators, along with other physicians and hospital staff, have repeatedly complained to the administration at Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, that many of the procedures performed by Defendant, DYLEWSKI, had been found by multiple medical review committees supervised and monitored by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, to not be medically indicated and had been performed based on fabricated and/or fraudulently interpreted studies and false clinical documentation. Specifically, Relators complained that patients were undergoing excessive, unnecessary, and improper procedures solely for the purpose of billing Medicare. When notified of committee findings and complaints about the improper and fraudulent conduct of

_____

[4] While Relators have personal knowledge that these fraudulent surgical and billing practices commenced in at least 2007, they acknowledge that the applicable statute of limitations limits claims to conduct occurring on or after June 5, 2008. *See* this Court's Order on Motion to Dismiss entered May 3, 2016 [DE 101], at 14-15.

DYLEWSKI, Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, argued with the reporting physicians and defended the actions of Defendant, Dr. DYLEWSKI stating that he was an important and high volume medical producer at BAPTIST HEALTH, BAPTIST HOSPITAL and SMH.

10.     Despite direct knowledge of DYLEWSKI's unethical and fraudulent conduct, Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, have taken little or no action.  Defendants have failed to notify either the affected patients or Medicare.  Instead of making the required refunds to the federal government for these false claims, Defendants have concealed the overpayments that resulted from their scheme and enjoyed the profits and benefits of their fraudulent conduct.

11.     Moreover, instead of making the necessary systemic changes to avoid such pervasive fraud in the future, Defendants, DYLEWSKI, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, have simply continued to bill Medicare and other government agencies for excessive, unnecessary, and not clinically indicated cardiac electrophysiology procedures and have falsely certified the medical necessity and appropriateness of those claims to federal healthcare programs.

12.     Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, have also repeatedly and falsely certified that they are in compliance with the regulatory conditions of participation in the Medicare program including the Stark Law, when they know that they are not in compliance, and thereby knowingly submitted additional false claims to Medicare.

13.     Accordingly, the HOSPITAL DEFENDANTS and DYLEWSKI have violated federal law as they have:  (a) submitted claims to Medicare and other government programs for medical procedures which were being performed where not clinically indicated, were excessive,

were medically not required, and were of no medical value; (b) falsely certified their compliance with the conditions of participation in the Medicare program including the Stark Law when they knew that they were not in compliance with such prerequisites; and (c) failed to return to the federal government such payments that they were not entitled to receive and that they knew they were not entitled to retain.

14.     The end result of these false claims is the unjustified and illegal enrichment of HOSPITAL DEFENDANTS and DYLEWSKI, and the corresponding misappropriation and loss of millions, and potentially tens of millions, of taxpayer funds.  Each named Defendant knowingly submitted false claims to federal healthcare programs in order to be paid for an unlawful medical billing scheme for which each Defendant received unlawful financial gain.

15.     On behalf of the United States, Relators seek to recover these damages as well as civil penalties arising from the false claims that Defendants caused to be submitted to the United States in violation of the FCA and the Stark Law, as well as money damages for the wrongful retention of overpayments and refunds that are due and payable to the United States.

## JURISDICTION AND VENUE

16.     This action is brought under the *qui tam* provisions of the United States False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA").  The FCA provides, *inter alia*, that any person who knowingly submits a false or fraudulent claim to the federal government for payment or approval is liable to the federal government for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each claim, plus three times the amount of the false claim.  31 U.S.C. § 3729(a).

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and pursuant to 31 U.S.C. § 3730(b).

18.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, are located in and conduct business in this District, and Defendant, DYLEWSKI, conducts business in this District.  Moreover, most if not all of the acts proscribed by 31 U.S.C. § 3729 and 42 U.S.C. § 1395nn that are alleged in this Second Amended Complaint occurred in this District and Defendants can be found, reside, or transact business in this District.

19.     Venue lies within the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b) and (c) , 31 U.S.C. § 3732(a), and 42 U.S.C. § 1395nn, because the acts and practices alleged in this Complaint occurred in this District and all of the Defendants can be found, reside, or transact business in this District.

## THE PARTIES

### I.     The Relators

20.     Under the FCA, a person with knowledge of false or fraudulent claims against the Government (a "Relator") may bring an action on behalf of the federal government and herself/himself.

21.     Relator, JAMES A. BURKS, M.D., is a citizen and resident of Miami, Florida. Dr. BURKS earned his undergraduate degree from Carnegie Mellon University; he then completed his medical education at New York University School of Medicine, and earned his post-doctoral Master's in Business Administration from the University of Miami.  He is a board certified vascular surgeon and medical doctor licensed to practice in Florida, as well as California.  Dr. BURKS was selected for a two year fellowship in vascular and endovascular surgery at Mount Sinai Medical Center in New York commencing in 2000.  After completing his fellowship in 2002, Dr. BURKS was in practice as a vascular surgeon at St Luke's-Roosevelt Hospital Center in New York, and an Assistant Professor of Surgery at Columbia University in

New York until 2003, when he began his practice as vascular surgeon at Defendant, SMH.  Dr. BURKS has been Chief of Vascular Surgery at SMH between 2009 and 2014, and since 2003 has been an active member of various peer review committees at SMH including the Peripheral Vascular Quality Assurance Committee at South Miami Hospital; the South Miami Hospital Credentials Committee; Chairman, Peripheral Vascular Interventions Credentials Committee at South Miami Heart Center; South Miami Heart Center Executive Committee; South Miami Heart Center Advisory Board; and Chief of Cardiovascular Clinical Service Line at South Miami Hospital.  Dr. BURKS has also served as a Voluntary Assistant Professor of Surgery at Florida International University.

22.    Relator, JAMES D. DAVENPORT, M.D., is a citizen and resident of Miami, Florida.  Dr. DAVENPORT earned his undergraduate degree from Penn State University; he then completed his medical education at Hahnemann University School of Medicine in Philadelphia, Pennsylvania.  He is a board certified cardiologist and medical doctor licensed to practice in Florida.  Dr. DAVENPORT was selected for a two year fellowship in cardiology commencing in 2002, immediately followed by a two year fellowship in Cardiac Electrophysiology both at Drexel University in Philadelphia, Pennsylvania.  After completing his fellowship in Cardiac Electrophysiology in July 2006, Dr. DAVENPORT moved to the South Florida area and began his employment with Defendant, DYLEWSKI, at the Arrhythmia Management Institute of South Florida.  Between 2010 and 2014, Dr. DAVENPORT was an active member of various peer review committees at Defendant, SMH, including the South Miami Hospital Electrophysiology Committee; South Miami Hospital Bylaws Committee; and the South Miami Heart Center Advisory Executive Committee. Dr. DAVENPORT has also served as a Voluntary Assistant Professor of Cardiology at Florida University.

9

23.     During his employment with Defendant, DYLEWSKI, Relator, Dr. DAVENPORT had daily contact with Defendant, DYLEWSKI, where he personally observed Defendant, DYLEWSKI, engage in a consistent pattern of health care fraud involving government healthcare programs.  Moreover, both Relators, Dr. DAVENPORT and Dr. BURKS, have personal knowledge of Defendant, Dr. DYLEWSKI's, practice of intentionally subjecting patients to multiple unnecessary cardiac procedures and performing excessive and not medically indicated procedures for the sole purpose of increasing the amount of physician and hospital reimbursements paid by Medicare and other federally-funded programs.

24.     All allegations in this Second Amended Complaint are based on evidence obtained directly by Relators, independently, and through their own labor and efforts.  The information and evidence they have obtained or of which they have personal knowledge, and on which these allegations regarding violations of the False Claims Act and the Stark Law are based, are their own personal observations, review of documents including medical records, billing records, as well as conversations with other physicians, staff and employees of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, and knowledge of other actions taken, or not taken, pursuant to policy, practice, or instructions from Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH.

25.     None of the allegations set forth in this Second Amended Complaint are based on a public disclosure of information in a criminal, civil, or administrative hearing; in a Congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or from the news media.  Rather, they are the independent declarations of the Relators.

26.     Relators are an original source of information within the meaning of the False Claims Act, 31 U.S.C. § 3730(e)(4)(B).

27.     Prior to the filing of this Complaint, Relators have voluntarily, through their attorneys, made all appropriate disclosures to the federal government, pursuant to 31 U.S.C. § 3730.

28.     The Relators have also complied with the statutory obligation to file the original Complaint under seal, without service on Defendants, for 60 days, pursuant to 31 U.S.C. § 3730(b)(2).

## II.     The Defendants and Their Business

29.     BAPTIST HEALTH is a Florida not-for-profit corporation with its principal place of business located in Coral Gables, Florida.  BAPTIST HEALTH employs more than 15,000 employees and more than 2,200 physicians.

30.     BAPTIST HEALTH operates eight hospitals throughout South Florida including Defendants, BAPTIST HOSPITAL, and SMH.   Through its network of medical facilities, BAPTIST HEALTH treats over one million patients annually.[5]

31.     BAPTIST HEALTH is organized and operates exclusively for the benefit of, to perform the functions of, or to carry out the purposes of Defendants, BAPTIST HOSPITAL and SMH, along with its other hospitals.

32.     BAPTIST HOSPITAL is a Florida not-for-profit corporation with its principal place of business in Miami, Florida.  BAPTIST HOSPITAL is currently a hospital licensed with 728 beds.  BAPTIST HOSPITAL is a Defendant, BAPTIST HEALTH facility, along with seven others including Defendant, SMH, and Doctors Hospital.

---

[5] *See* https://baptisthealth.net/en/about-baptist-health/pages/default.aspx.

33.     SMH is a Florida not-for-profit corporation with its principal place of business located in South Miami, Florida.

34.     SMH is currently a hospital licensed for 452 beds. In addition, it houses the South Miami Heart Center which is a full-service cardiac and vascular care facility providing comprehensive medical services for inpatient, outpatient and emergency services for cardiovascular diseases.  SMH is a Defendant, BAPTIST HEALTH facility, along with seven others including Defendant, BAPTIST HOSPITAL, and Doctors Hospital.

35.     Defendant, DYLEWSKI, is sued as an agent and/or employee of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, acting within the course and scope of said agency and/or employment, with the knowledge and/or consent of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH.   All of the allegations against Defendant, Dr. DYLEWSKI stated herein are related to conduct that occurred while he was an employee and/or agent of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, and while he was acting within the course and scope of his employment and/or agency at BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH.   BAPTIST HEALTH, BAPTIST HOSPITAL and SMH consented to, participated in, and had full knowledge of the fraudulent conduct of Defendant, Dr. DYLEWSKI at all times material hereto.

## APPLICABLE LAW AND REGULATIONS

### III. The False Claims Act

36.     The FCA, as amended, provides in pertinent part that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a
> false or fraudulent claim for payment or approval; (B) knowingly makes,
> uses, or causes to be made or used, a false record or statement material to
> a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to
> be made or used, a false record or statement material to an obligation to
> pay or transmit money or property to the Government, or knowingly
> conceals or knowingly and improperly avoids or decreases an obligation to

> pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990…plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

37.     The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

38.     The FCA is the federal government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong. 2d Sess. at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266.

## IV.     The Stark Law

39.     The Stark Law, 42 U.S.C. § 1395nn, prohibits a doctor from referring Medicare patients to a hospital if the doctor has certain specified types of "financial relationships" with that hospital.  *See* 42 U.S.C. § 1395nn(a)(1)(A).  Moreover, the Stark Law prohibits that same hospital from presenting claims for payment to Medicare for any medical services it rendered to such referred patients. *See* 42 U.S.C. § 1395nn(a)(1)(B).

40.     The Stark Law broadly defines "financial relationships," and the statute contains numerous exceptions to that definition. *See id.* § 1395nn(a)(2), and (b)-(e).  However, where such a Stark-defined "financial relationship" exists, as it does here between Defendant, DYLEWSKI, and Defendants, BAPTIST HEALTH, and/or BAPTIST HOSPITAL, and/or SMH, a doctor "may not make a referral to the [hospital]," and the hospital "may not present or cause to be present[ed] a [Medicare] claim." *See id.* § 1395nn(a)(1).

13

41.     One of the exceptions to the Stark-defined "financial relationships" is a bona fide employment relationship.  In relevant part, the statute states:

(2) Bona fide employment relationships

Any amount paid by an employer to a physician (or an immediate family member of such physician) who has a bona fide employment relationship with the employer for the provision of services if--

(A)     the employment is for identifiable services,

(B)     the amount of the remuneration under the employment—

(i)  is consistent with the fair market value of the services, and
(ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician,

(C)     the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer,

Violation of the statute gives rise to a claim under the FCA and requires the refund of any amounts collected in violation of subsection (a)(1), in addition to civil monetary penalties. *See id.* § 1395nn(g).

**V.     Cost Reporting and Claims Processing Procedures Under The Medicare Program**

42.  In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426, 426-1.

43.     Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

44.     CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund.  42 U.S.C. § 1395(u).  In this capacity, the fiscal intermediaries act on behalf of CMS.  42 C.F.R. § 413.64.  Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

45.     There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them.  42 U.S.C. §§ 1395j-1395w-5.  The allegations herein involve both Parts A and B for services billed by the Defendants to Medicare.

46.     Under Medicare Part A, hospitals enter into an agreement with Medicare to provide health care items and services to treat Medicare patients.  The hospital, also called a "provider," is authorized to bill Medicare for that treatment. Most hospitals, including the Defendant's hospitals, derive a substantial portion of their revenue from the Medicare Program.

47.     At all times material hereto, the Medicare program was administered by individual states, including Florida, through private insurance carriers.  These carriers contracted with the Department of Health and Human Services and served as fiscal intermediaries to receive, adjudicate, and pay Medicare claims submitted to it by Medicare beneficiaries, physicians, or providers of services.

48.     In order to get paid, a hospital completes and submits a claim for payment on a designated claim form, which, during the relevant time period, was or has been designated either

as a Form UB-4 (also known as a CMS-1450) or a Form UB-92.  This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient.  The Medicare Program relies upon the accuracy and truthfulness of the UB-4/UB-92 to determine whether and what amounts the hospital is owed.

49.     In addition, at the end of each fiscal year, CMS requires hospitals to submit a Form 2552, more commonly known as the Hospital Cost Report, to the fiscal intermediary.  The Hospital Cost Report contains information on facility characteristics, utilization data, costs, Medicare settlement data, financial statement data, and cost and charges by cost center.  42 C.F.R. § 413.20(b), 42 U.S.C. § 1395g.

50.     While Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-4s/UB-92s) during the course of the fiscal year, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider and is reported on the annual Hospital Cost Report. This total determines Medicare's liability for services rendered to Medicare beneficiaries during the course of fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount due to either the Medicare Program or the provider.

51.     Medicare relies on the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than the provider has already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60, and 413.64(0)(1).

52.     A key purpose of the Hospital Cost Reports is to protect the federal government from loss due to mistake or fraud.  Medicare has the right to audit Hospital Cost Reports and

financial representations made by program participants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  However, while Hospital Cost Reports are potentially subject to audit review, it is generally known throughout the health care industry that fiscal intermediaries do not have sufficient resources to perform in-depth audits on the majority of Hospital Cost Reports submitted to them.  It is also generally known through the health care industry that two to three years will elapse from the time Hospital Cost Reports are filed until they are finalized. For these reasons, the cost reporting system relies substantially on the good faith of providers to prepare and file accurate Hospital Cost Reports.

53.     To this end, the Hospital Cost Report, Form 2552, contains the following warning:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

> That advisory is then followed by the following "Certification," which must be signed by the chief administrator of the provider or a responsible designee of the administrator:

> CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and

regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

54.     Under Medicare Part B, physicians, like DYLEWSKI, must enroll with Medicare to be eligible for payment of covered medical services provided to treat patients who are beneficiaries under the Medicare program.  The physician is authorized to bill Medicare for that treatment. Many physicians, like DYLEWSKI, derive a substantial portion of their revenue from the Medicare Program.  In this case, the revenue is derived for the benefit of his employer and/or his agency, Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL and/or SMH, which, in turn, pay DYLEWSKI a substantial salary and benefits based upon performance and revenue generated from his billings.

55.     In order to get paid from Medicare, providers, like Defendants herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS 1500.  This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient.  The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

56.     To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

57.     That certification is then followed by the following "Notice:"

> Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## VI.   Conditions of Participation and Conditions of Payment

58.   To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc.  The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

### A.   Medical Necessity and Appropriateness Requirements

59.   One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information.  42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

60.   Various claims forms, including but not limited to the Hospital Cost Report and the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations.   42 U.S.C. § 1395n(a)(2);  42 U.S.C. § 1320c-5(a);  42 C.F.R §§ 411.400, 411.406.   Providers must also certify that the information submitted is correct and supported by documentation and treatment records.  *Id. See also*, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

61.   The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

### B.    Obligation to Refund Overpayments

62.    As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports).  42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C.  *See also* 42 C.F.R. §§ 489.40, 489.31.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.  Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments.  42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

63.    Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.  42 U.S.C. § 1395u(*l*)(3).  In such cases, the overpayment is subject to recoupment.  42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments.  42 U.S.C. § 139*5l*(j).

64.    Similarly, refunds are also required where payments were improperly made in violation of the Stark Law.  42 U.S.C. § 1395nn(g).

### C.    Peer Review and Quality Assessment Obligations

65.    Another important requirement for a hospital that wishes to participate in the Medicare Program is that the hospital "must have an organized medical staff that operates under bylaws approved by the governing body and is responsible for the quality of medical care provided to patients by the hospital."  42 C.F.R. § 482.22. Hospitals must "develop, implement, and maintain an effective, ongoing, hospital-wide, data-driven quality assessment and performance improvement ['QAPI'] program."  42 C.F.R. § 482.21.

66.    As part of its QAPI program, a hospital "must set priorities for its performance improvement activities that (i) focus on high-risk, high-volume, or problem-prone areas; (ii)

consider the incidence, prevalence, and severity of problems in those areas; and (iii) affect health outcomes, patient safety, and quality of care." *Id.* § 482.21(c)(1).

67.     Finally, a hospital "must track medical errors and adverse patient events, analyze their causes, and implement preventive actions and mechanisms[.]" *Id.* § 482.21(c)(2).

## VII.     Other Federally-Funded Health Care Programs

68.     Although false claims to Medicare are the primary FCA violations at issue in this case, the patients who were subjected to the medically unnecessary procedures that are the subject of this action were beneficiaries of one of three federally-funded health care benefit programs – Medicare, Medicaid, or TRICARE/CHAMPUS.   Accordingly, those other two programs are briefly discussed as well.

69.     The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.*, is a system of medical assistance for indigent individuals.  CMS administers Medicaid on the federal level, and reimbursement of hospital costs or charges is governed by Part A of Medicare, through the hospital cost report system, and reimbursement of physician charges is governed by Part B of Medicare. As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of *appropriate* and *necessary* care to Medicaid beneficiaries.

70.     TRICARE, formerly known as CHAMPUS, is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the

Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, *et seq*.).   Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).   And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records.   32 C.F.R. §§ 199.9(b)(3)-(b)(5).

71.     The process for billing and receiving payment from Medicare is that after a procedure is performed or a service is provided that gives rise to a potential reimbursement by Medicare, Defendants first assign a Medical Claim Number ("MCN") to the procedure.

72.     Next, a claim for payment is submitted to the fiscal intermediary, and a designated claim form, either a Form UB-4 or Form UB-92, is created.   This form contains the patient-specific information, including the diagnosis and the type of services that were provided to the Medicare beneficiary.

73.     As a matter of course, the Form UB-4 or Form UB-92, and a CMS 1500 for the physician services, are typically submitted to the appropriate fiscal intermediary within a few business days after the medical service was provided but, in accordance with CMS regulations, in no event more than 120 days later.

74.     Defendants submit claims for all goods and services that are provided to patients who are beneficiaries of federally-funded health care programs.

**APPLICABLE MEDICINE**

75.     The allegations of false claims herein involve a variety of cardiac procedures associated with cardiac electrophysiology.   Relators, Dr. BURKS and Dr. DAVENPORT, have

personal knowledge of the fraudulent conduct related to unnecessary multiple procedures and improper performance of surgical procedures.  Therefore, we will briefly describe the area of medical specialty and some examples of the fraudulent conduct related to both.

76.     Cardiac electrophysiology is a branch of cardiology involved with the treatment of electrical conduction disturbances of the heart.  These disturbances are called arrhythmias (abnormal heart rhythms) and can lead to loss of consciousness (syncope), congestive heart failure (shortness of breath, lack of energy), palpitations, fatigue, or even sudden death. Arrhythmias can be caused by various medical conditions including coronary artery disease; high blood pressure; changes in the heart muscle (cardiomyopathy); valve disorders; electrolyte imbalances in the blood, such as sodium or potassium; injury from a heart attack; and as a result of the healing process after heart surgery.  Arrhythmias can also be caused by certain substances or medications, such as caffeine, nicotine, alcohol, cocaine, inhaled aerosols, diet pills, and cough and cold remedies.  Emotional states such as shock, fright or stress can also cause irregular heart rhythms.  These electrical conduction disturbances can often be treated with medication but frequently diagnosis of and treatment of arrhythmia requires invasive measures if clinically indicated.

77.     Central to the practice of electrophysiology is an examination referred to as an echocardiogram (ECHO) which is a noninvasive ultrasound based diagnostic study which is used to identify structural, valvular and wall motion abnormalities of the heart.  It is frequently used to calculate the ejection fraction of the heart which is a measure of the heart's pumping ability. Specifically, ejection fraction ("EF") is a measurement usually expressed as a percentage of blood leaving the heart each time it contracts.  During each heartbeat cycle, the heart contracts and relaxes. When the heart contracts, it ejects blood from the two pumping chambers: the right

and left ventricles. A normal heart pumps a little more than half of the heart's blood volume with each beat with LVEF ranges from 55-70%.

78.     At all times material hereto, Defendant Dr. DYLEWSKI was not on the panel of those authorized to read ECHO's at BAPTIST HOSPITAL or SMH and yet he consistently read the ECHO's of his patients in order to perform medically unnecessary and not clinically indicated procedures and, in turn, fraudulently submit bills for all of these procedures. The purpose of DYLEWSKI reading the ECHO's was to fraudulently bill Medicare to generate revenue and to insert false EF results into patient charts to validate the need for additional EP procedures.

79.     When someone has a heart attack, the heart muscle can become permanently damaged which is referred to as ischemic cardiomyopathy, and the EF decreases corresponding to the severity of the injury.  There are also less common causes of damage to the heart muscle leading to decreased pumping ability that are often reversible and these are referred to as nonischemic cardiomyopathy.

80.     When the heart muscle is permanently damaged causing a decrease in the EF equal to or less than thirty-five percent (35%) in the setting of clinical heart failure, the patient is at risk for malignant arrhythmias and sudden cardiac death and implantation of an automatic implantable cardioverter defibrillator (AICD) can be indicated to continuously monitor the heart's rhythm and to pace or shock the heart if it stops beating or fibrillates.  This is referred to as sudden cardiac death.

81.     An electrophysiologic study ("EP Study") is indicated to evaluate a patient for a suspected or known arrhythmia.  It is an invasive, provocative test in which catheters are advanced from an artery or vein in the groin into the heart and is done to induce an arrhythmia

and to identify the aberrant conduction pathway that is causing it. Because it is an invasive test, an EP Study is recommended when other tests, such as a standard electrocardiogram ("EKG"), Holter monitor, event recorder, stress test, ECHO or angiogram cannot provide enough information to thoroughly evaluate your abnormal heart rhythm.

82.     Treatment of an arrhythmia may be ablative (burning away of the abnormal conduction pathways which have been identified), cryoablation (freezing away the abnormal conduction pathways which have been identified) or with implantation of an electrical device (pacemaker, AICD, Biventricular AICD or Biventricular pacemaker).

83.     An AICD can sense a dangerous arrhythmia and is able to cardiovert (shock via the device) the patient if a malignant arrhythmia is noted or pace the heart if a prolonged, dangerous pause is sensed, or cardiac resynchronization by continuous pacing of the left ventricle from two opposite sites to resynchronize the heart walls of the failing heart by improving the timing of the contraction of the heart walls during each and every heart contraction. These devices are technologically advanced and are some of the most costly device implants used in medicine. The above devices are commonly used in the practice of electrophysiology but have strict criteria pertaining to their use.  While these implanted devices have a limited battery life and need to be replaced on a regular basis when the battery energy consumed, they do not need to removed or replaced in order to update the software. The device is essentially a computer with various storage capacities to alert the physician to battery life and potential issues with device hardware or arrhythmias recorded on the device.

84.     Clinical and/or medical indications for these procedures and the implantation of electrical devices include:

**A.  AICD:**

Left Ventricular EF (LVEF): less than or equal to 35% without reversible causes.

25

**B.  CARDIAC RESYNCHRONIZATION THERAPY (CRT):**

EF less than or equal to 35% without reversible causes and QRS duration 120ms or greater with left bundle branch block on ECG.

**C.  PACEMAKER:**

Class I:  Any symptomatic bradycardia.  Bradycardia is a slow heart rhythm with a rate below 60 beats per minute.

Class II:  Any impressive bradycardia without symptom correlation and/or rhythm abnormalities associated with high risk of progression.

Class III:  Neither symptomatic or at significant risk for progression.

**D.  DEVICE BATTERY/GENERATOR CHANGE:**

At end of life or replacement interval  - *not for a software upgrade.*

**E.  EP STUDY:**

Symptomatic arrhythmia unresponsive to medical therapy or patient request to not take medications

**F.  AV OPTIMIZATION**

Patients with implanted pacemakers/AICD/BiVAICD who are not responding to pacing therapy procedures can be considered, however, not several times a year on the same patient. This procedure is of historical relevance in the modern era.

85.    For almost a decade, Defendant, DYLEWSKI, has performed the above listed procedures despite the lack of the foregoing required clinical or medical indications, all with the knowledge and consent of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, solely for the purpose of submitting false claims for payment to the federal government in order to increase revenue by many millions of dollars and enjoy the corresponding ill-gotten profits for the benefit of all of the Defendants.

26

86.     Other procedures where Relators have witnessed a consistent pattern of fraud by Defendants include the performing of unnecessary Head Upright Tilt Tests which record your blood pressure and heart rate on a minute-by-minute basis while the table is tilted in a head-up position at different levels.



The Head Upright Tilt Test is a lengthy and uncomfortable test for the patient, but lucrative for billing purposes.  Both while he was employed by Defendant, Dr. DYLEWSKI and while working in adjoining procedure rooms at Defendant, SMH, Relator, Dr. DAVENPORT has witnessed Defendant, Dr. DYLEWSKI regularly schedule patients, including elderly patients with many morbidities to have medically  unnecessary Head Upright Tilt Tests followed by EP Studies which is highly irregular patient management for elderly and feeble patients.

87.     The overutilization of these cardiac electrophysiology procedures results in significantly increased costs to the federal government and significantly increased profits for the offending providers. These reimbursement amounts must be added to the reimbursements made to BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH for anesthesiologists' fees, hospital fees, and other related services billed with each additional procedure billed by Defendants.

<u>**ALLEGATIONS**</u>

88.     Defendants BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, have turned a blind eye to the systemic overutilization of medical procedures and improperly inflated billing practices of DYLEWSKI which has led to the submission of hundreds, and more likely

thousands of false and fraudulent claims to Medicare and other federally-funded health care programs since at least 2007.[6]

## I.      **Dr. BURKS' Personal Knowledge**

89.    Between 2009 and 2014 Dr. BURKS served as a member of the South Miami Heart Center Advisory Board and the South Miami Heart Center Executive Committee. He was elected by his peers to be the Chief of the Cardiovascular Clinical Service Line and thereafter was selected to be the Chairman of the South Miami Heart Center Executive Committee. The Cardiovascular Clinical Service Line ("CCSL") Committee was comprised of physicians at South Miami Heart Center who were leaders in their fields. They were elected by their peers to serve on the committee which included two (2) vascular surgeons, two (2) interventional cardiologists, two (2) interventional radiologists, two (2) cardiac surgeons, two (2) medical cardiologists, and two (2) electrophysiology cardiologists, as well as Dr. Ted Feldman, the Medical Director of the South Miami Heart Center, and Dr. Francisco Rodriguez Moran, the Medical Director of Critical Care at Defendant, SMH. Although Dr. BURKS is a board certified vascular surgeon, by virtue of his position as the Chief of said committee, he became a de facto hospital Chief of Cardiology reviewing and having firsthand knowledge regarding DYLEWSKI's practice of cardio electrophysiology. DYLEWSKI's medical and billing practices became the focal point of thorough medical reviews by multiple committees upon which he served.

90.    One recurring and unaddressed issue related to DYLEWSKI's performance of multiple "AV Optimization" procedures in which an echocardiogram is performed and a Permanent Pacemaker ("PPM") device is calibrated to achieve better synchronization. The

---

[6] *See* footnote 4, *supra*.

matter came to the committee's attention because of the huge volume of AV Optimizations performed by DYLEWSKI. The committee conducted a thorough investigation and concluded that the AV Optimization procedures performed by DYLEWSKI were medically outdated, unnecessary, and not medically indicated. An investigation indicated that the number of AV Optimization procedures performed by DYLEWSKI at SMH was "5 standard deviations" above any other hospital in the United States. For example, if DYLEWSKI was doing five hundred (500) AV Optimizations *per year*, the average AV Optimizations performed by other hospitals was two (2) per year. The administration at Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH had been aware of this matter for years and had chosen to take no action.

91.     In 2011, the committee investigated the volume of replacements of Automatic Implantable Cardioverter Defibrillators (AICD) and PPM devices by DYLEWSKI even though the devices were *functioning normally* and there was *adequate battery life* left on the devices. Multiple experts were polled and the physicians on the committee determined that there was no medical necessity for the replacement of a properly functioning device with adequate battery life, it was an expensive procedure, and put the patient at risk of injury or infection during the replacement procedure with no clinical benefit. This matter was brought to the attention of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH, but no remedial action was taken by any of them.

92.     Prior to 2012, there were numerous instances identified by staff members and brought to the committee in which an AICD was placed by DYLEWSKI with *no medical documentation* of the patient's heart Ejection Fraction ("EF") prior to the placement. These devices are indicated ONLY in patients whose EF is less than 35%. The devices alone can cost up to $50,000 not including the facility fee and the physicians' fee. These matters were brought

to the attention of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH, and no remedial action was taken by any of them.

93.    The CCSL Committee meetings were well attended by committee members and the monthly meetings lasted between 2 and 2 & ½ hrs.  Additionally, at all meetings, Ms. Carol Biggs, Vice President, South Miami Heart Center, an employee of BAPTIST HEALTH, was present, took detailed notes, and actively participated in the review of the medical practices and billing practices of  DYLEWSKI.  Ms. Biggs was, in fact, the Chief Administrator of the South Miami Heart Center.

94.    Further, Dr. Ted Feldman, a BAPTIST HOSPITAL board certified cardiologist, served as Medical Director of the South Miami Heart Center at Defendant, SMH, and a paid consultant by Defendants, BAPTIST HEALTH, participated in all of the CCSL committee meetings. Ms. Biggs and Dr. Feldman were appointed to the committee by the CEO of Defendant, BAPTIST HEALTH, Mr. Wayne Brackin.  Dr. BURKS has firsthand knowledge that Ms. Biggs and Dr. Feldman spoke directly to Defendant, BAPTIST HEALTH CEO, Wayne Brackin, about the egregious medical practices of DYLEWSKI.

95.    Furthermore, Mr. Lincoln Mendez, CEO of Defendant, SMH attended almost all of the committee meetings between 2009 and 2014 on behalf of Defendant, SMH and Defendant, BAPTIST HEALTH.

96.     Additional employees of Defendant, BAPTIST HEALTH who were present and participated in all of the DYLEWSKI reviews by the CCSL Committee included Quality Assurance Committee members as well as Dolores Earle, a nurse practitioner on behalf of Performance Improvement at Defendant, SMH, and Ellen Reddick, head of Performance Improvement at Defendant, SMH.

97.     Further attendees on a regular basis were Dr. Niberto Moreno, Chief of Cardiothoracic Surgery at Defendant, BAPTIST HEALTH, and Dr. Lynn H. Harrison, a cardiovascular surgeon who was Clinical Director of Cardiac Surgery on behalf of Defendant, BAPTIST HEALTH.

98.     At the conclusion of one of the CCSL Committee meetings pertaining to the review of DYLEWSKI, his medical practices, his wrongful billing practices, and the fact that he was routinely performing unnecessary medical procedures, Dr. Harrison stated: "DYLEWSKI's medical  privileges should be revoked and he should be put in jail because 'this is criminal'". Dr. Harrison reviewed medical charts, billing records and also concluded that a large percentage of the medical procedures being performed by DYLEWSKI were only "done to make money" and there was no reason for patients to be put through the medical procedures by DYLEWSKI. DYLEWSKI did procedures that should have never been done – there was no indication for them.

99.     The CCSL Committee reviewed at least ten (10) randomly selected medical charts and billing records of DYLEWSKI patients which were reviewed carefully by all of the medical specialists on the committee.  The conclusion was that "none" of the cases was medically indicated. DYLEWSKI should not have done any of the procedures and there were serious medical complications suffered by the patients.   The committee concluded that the performing of multiple procedures, changing of medical devices because of alleged issues with batteries and problems with wiring of pacemakers were all medically unnecessary procedures.

100.    Dr. BURKS has personal knowledge that each of the medical charts of DYLEWSKI's patients described above, indicated that the patients were, in fact, Medicare patients. He personally reviewed the face sheets of each patient as well as the medical charts

which showed the demographics of the patient, the fact that they were Medicare patients and bills had been submitted for these improper and medically unnecessary procedures by Defendants, DYLEWSKI, SMH, BAPTIST HOSPITAL, and BAPTIST HEALTH.

101.     Ms. Biggs, on behalf of Defendant, SMH, heard and took notes of all of the detailed discussions at the regularly scheduled monthly meetings of the CCSL Committee including the discussions of the medically unnecessary procedures that were being billed to federal healthcare programs including Medicare. She further heard the complete discussion by all committee members that the medical privileges of DYLEWSKI should be suspended until such time as an external review could be accomplished.

102.     Dr. BURKS had multiple conversations with Ms. Biggs during which he stated that DYLEWSKI's privileges should be suspended and that the medical bills being submitted by DYLEWSKI and SMH, BAPTIST HOSPITAL and BAPTIST HEALTH to Medicare were for procedures that were not medically necessary.  DYLEWSKI was performing procedures on sick, old people who were being put through life-threatening procedures that were totally unnecessary. He would then submit false claims to Medicare for each elderly patient. Ms. Biggs, as an administration representative on behalf of the Hospital Defendants, had full knowledge for years of DYLEWSKI's wrongful medical and billing practices.

103.     Dr. BURKS has personal knowledge that arrhythmia procedures performed by DYLEWSKI were medically unnecessary and he was putting patients at risk of surgical complications and infection. Additionally, some of the charts reviewed did result in patient deaths. The committee members had no ambiguity. At the end of one meeting, the committee unanimously voted to have the medical privileges of DYLEWSKI suspended until a complete external review could be accomplished. This vote was made by a cross-section of physicians

from various medical specialties who all concluded that the practices reviewed of DYLEWSKI patients indicated that there was no medical value and no clinical indication for the procedures.

104.     In February 2013, Dr. BURKS convened an Ad Hoc Committee of the Advisory Board to investigate several of DYLEWSKI's Opportunities for Improvement (OFIs). The committee reviewed and unanimously agreed that in all seven (7) of the OFIs that were clinically reviewed none of the procedures that DYLEWSKI performed were clinically indicated and all of them were felt to have involved serious and avoidable complications.  The administration was notified and, shockingly, no action was taken. Those seven (7) patient cases are identified in ¶¶ 172 – 178 of the SAC.

105.     Ted Feldman, M.D., Medical Director of South Miami Heart Center, a cardiologist representing Defendant, BAPTIST HEALTH at all CCSL meetings, was elected to serve on the Ad Hoc Committee that studied the medical practices of DYLEWSKI.  Dr. Feldman was vocal and adamant that the administration should immediately stop DYLEWSKI from practicing medicine. Significantly, Dr. Feldman repeatedly commented that his review of the medical charts that had also been reviewed by the CCSL Committee indicated not medically required procedures performed by DYLEWSKI solely for the purpose of submitting medical bills.  At one point, Dr. Feldman spoke to Mr. Wayne Brackin, Mr. Lincoln Mendez, and Ms. Carol Biggs (at separate meetings) and was adamant that the billing practices of DYLEWSKI clearly indicated billing federal healthcare programs for medically unnecessary and improper medical procedures. Dr. Feldman, through direct conversations with Mr. Brackin, Mr. Mendez and Ms. Biggs, voiced his frustration that unless the administration at Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH suspended DYLEWSKI's medical privileges, he

would contact the press to publicize the wrongful medical practices and billing practices of DYLEWSKI.

106. Dr. BURKS has personal knowledge of comments by Dr. Harry Aldrich, a non-invasive cardiologist who served as Chief of Cardiovascular Clinical Service Line, South Miami Heart Center, made during multiple CCSL Committee meetings and personal conversations concerning DYLEWSKI, his wrongful medical practices, the medically unnecessary medical procedures being performed by DYLEWSKI, patient harm, and specifically the medically unnecessary use of AV Optimizations performed by DYLEWSKI.

107. The CCSL Committee and later the Ad Hoc Committee investigated DYLEWSKI's medical practices for more than sixteen (16) months. Dr. BURKS has personal knowledge that high ranking corporate representatives of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH including Lincoln Mendez, CEO/President of SMH, and Carol Biggs, Vice President of South Miami Heart Center, attended and repeatedly heard serious issues of the daily practices of DYLEWSKI including his overbilling practices for medically unnecessary arrhythmia procedures.

108. The By Laws of Defendants, BAPTIST HOSPITAL and SMH required that when the number of OFIs reached a significant number pertaining to any physician (here more than 6 OFIs within a 12 month period filed against DYLEWSKI), an Ad Hoc Committee shall review the physician's conduct. An Ad Hoc Committee was formed only focused on the practices of DYLEWSKI.   The committee members included Ted Feldman, M.D., board certified cardiologist and Medical Director at SMH; Dr. Dan Krauthamer, board certified interventional cardiologist and Medical Director at SMH in that field; Hakop Hrachian, M.D., board certified cardiologist and electrophysiologist; and Dr. BURKS served as Chair of the committee.  In 2013,

the Ad Hoc Committee met on multiple occasions to review at least ten randomly selected billing and medical charts for DYLEWSKI patients. During these meetings, the committee spent more than six (6) hours reviewing the medical charts and unanimously concluded that the medical practices were egregious, that the medical privileges of DYLEWSKI should be suspended pending an independent review by a third party consultant, that each DYLEWSKI medical case reviewed involved medically unnecessary arrhythmia medical procedures which provided no medical benefit to the patient, and subjected elderly, feeble and immobile patients to serious harm.

109.    Dr. BURKS has personal knowledge that the unanimous vote of the Ad Hoc committee was communicated to Lincoln Mendez and he was advised at length that each randomly selected medical procedure performed by DYLEWSKI which had been reviewed by the Ad Hoc Committee involved medically unnecessary procedures.  Thereafter, the matter was referred to the CCSL Committee in early 2013 which unanimously voted to have the medical privileges of DYLEWSKI suspended pending an independent review. Two (2) days after the vote was taken, Defendant, SMH CEO Lincoln Mendez contacted Dr. BURKS and advised that both he and the CEO of Defendant, BAPTIST HEALTH, Wayne Brackin, were furious that the action had been taken and ordered the CCSL committee to rescind its actions.  Lincoln Mendez stated that another committee would undertake another review. The committee thereafter took a vote and rescinded the action due to the pressure placed upon its members by BAPTIST HEALTH administration.  Dr. BURKS has personal knowledge that Drs. Ted Feldman, Hakop Hrachian, Harry Aldrich, and Lynn Harrison were outraged at the conduct of the BAPTIST HEALTH administration in forcing the rescission of the vote.  Dr. BURKS has personal knowledge, based upon ongoing conversations within the CCSL Committee and private

35

conversations outside of the meetings, that Dr. Ted Feldman, Dr. Harry Aldrich, Dr. Hakop Hrachian, Dr. Lynn Harrison and Dr. Dan Krauthamer reviewed DYLEWSKI patient medical charts and billing records and stated that arrhythmia medical procedures performed by DYLEWSKI on his patients including AV Optimizations, replacements of AICDs, replacement of pacemaker batteries that were medically unnecessary, arrhythmia device replacements, Cardiac Resynchronization Therapy, device battery/generator changes and electrophysiology studies were performed in an excessive manner by DYLEWSKI and provided no medical value and were not "medically required" for his patients during the period of time 2009 through 2013 when the CCSL committee reviewed and investigated the medical practices of DYLEWSKI.

110.    Dr. BURKS has personal knowledge that Dr. Harry Aldrich investigated the outdated and unnecessary utilization of AV Optimizations by DYLEWSKI.     Dr. Aldrich determined that every DYLEWSKI AV Optimization medical chart that he reviewed indicated that the utilization of an AV Optimization was medically unnecessary, not medically required, and should never have been performed. Dr. Aldrich determined that the number of AV Optimizations performed by DYLEWSKI per year was 5 standard deviations above any other hospital in the country. Dr. BURKS has personal knowledge that Ms. Carol Biggs and Mr. Lincoln Mendez were present at every CCSL Committee meeting when the over utilization of AV Optimization procedures that were not medically required was reported by Dr. Aldrich to the committee.

111.    Dr. BURKS had multiple conversations with Lincoln Mendez during which the subject of the high volume of medically unnecessary AV Optimizations and other arrhythmia procedures performed by DYLEWSKI was discussed.  Lincoln Mendez responded and advised Dr. BURKS that the HOSPITAL DEFENDANTS were fully aware of the information but that

"wasn't a priority" involving DYLEWSKI at that time.  No action was ever taken by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL or SMH in response to the repeated complaints by Dr. BURKS and the various committees.

112.    Dr. BURKS has personal knowledge that every DYLEWSKI EP case reviewed by the CCSL Committee in which there was a replacement of AICD and PPM devices was not medically required nor clinically indicated. Each device was functioning normally, there was adequate battery life left on each device, and there was no medical necessity nor any reason to perform each procedure other than to generate revenue. This matter was brought to the attention of administration representatives at multiple committee meetings including Mr. Lincoln Mendez, Ms. Carol Biggs, Nurse Dolores Earle, and Ellen Reddick.

113.    The board certified physicians of the CCSL Committee unanimously agreed that each DYLEWSKI patient medical chart reviewed indicated that DYLEWSKI's procedures included an inappropriate indication for device replacement and put the patients at risk of injury or infection during the replacement procedures with no clinical benefit. Despite advising the administrations at Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, no action was taken by any of them.

114.    The CCSL committee reviewed medical charts of DYLEWSKI patients involving the placement of AICDs where there was questionable or no documentation of the patient's Ejection Fraction ("EF") prior to the placement of the device.  These medical devices are indicated only in patients whose EF is less than 35%. The devices alone cost as much as $50,000 not including the facility fees and physician fee. Dr. BURKS observed in the medical charts reviewed by the committee multiple examples of an EF of 50% or greater and still DYLEWSKI performed the procedure and submitted the false claims to Medicare for payment. Dr. BURKS

reviewed the face sheets of the packet of patients' medical records that indicated the name of the patient, date of procedure, age of the patient, and whether the patient was covered by private insurance or Medicare.  Dr. BURKS reviewed DYLEWSKI's medical charts in which he stated false information including patient history indicating that the patient was a spry and healthy patient when other physicians noted on the same medical chart for the same date of service that the patient was elderly, immobile and/or suffering from dementia. There was no medical necessity for the performance of any arrhythmia procedure on a bedridden patient. Further, the committee noted multiple instances in which DYLEWSKI entered in the medical chart that the EF was 20% or 30% when another attending physician noted an EF of 50% or 60% or more for the same patient at the same time.  Dr. BURKS believes the performance of procedures on patients in which DYLEWSKI stated false information constituted fraudulent medical billing practices.

115.    Multiple CCSL Committee members including Dr. Ted Feldman and Dr. Hakop Hrachian, stated in the presence of administration representatives for Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH that SMH, BAPTIST HOSPITAL and BAPTIST HEALTH were covering up the conduct of DYLEWSKI because he was a "high volume producer."

116.    Dr. BURKS has personal knowledge that the Defendants submitted for payment to Medicare the cases described as patients 1 through 7 in the SAC [¶¶ 172 - 178].  DYLEWSKI patient medical charts including billing information were reviewed personally by Dr. BURKS during his duties as Chief of the CCSL Committee.

117.    Dr. BURKS has personal knowledge that medically unnecessary pacemaker procedures and AICD procedures were billed to Medicare by DYLEWSKI at a cost of between

$25,000 to $50,000 for each device. Additionally, an extremely high volume of AV Optimizations and Tilt Table Tests, which have a Medicare reimbursement to the physician of a few hundred dollars and to the hospital of thousands of dollars, were done by DYLEWSKI at a very high rate.

118.   Dr. BURKS has personal knowledge that DYLEWSKI caused physical harm, including death, to multiple patients as a result of medically unnecessary procedures billed to Medicare for financial gain by DYLEWSKI and the HOSPITAL DEFENDANTS.

119.   Dr. BURKS has personal knowledge that Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH ignored constant pleas to correct the conduct of DYLEWSKI and that BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH knew about DYLEWSKI's performance of medically unnecessary procedures and billing for same. The administration was made aware of the medically unnecessary and unindicated procedures being performed by DYLEWSKI and chose not to act despite the recommendations of various committees, including the Ad Hoc Committee recommendations to revoke his privileges and obtain an independent external review. Based upon conversations with staff, his personal observations at BAPTIST HOSPITAL and SMH, his personal review of medical charts and billing information during his duties as Chief of the CCSL Committee, Dr. BURKS knows that Defendants, DYLEWSKI, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH were submitting false claims to Medicare for ongoing medical procedures that were not medically indicated and not medically required.[7]

---

[7] These various committees, including the CCSL committee and the Ad Hoc Committee, were peer review committees and any and all documents provided during those committee meetings were prohibited from being removed from the meeting room at any time including at the conclusion of the meetings.  Other than by breaching his duties and stealing the documents, Dr. BURKS did not have any avenue to properly obtain the documented evidence of the Defendants' fraudulent conduct reviewed and discussed during committee meetings.

II.    **Dr. DAVENPORT's Personal Knowledge**

120.    Dr. DAVENPORT witnessed the Medicare fraud of DYLEWSKI while he was a colleague and his partner during 2006 to 2007 and then between 2007 and 2014 in his capacity as a practicing physician at the Defendant, South Miami Heart Center ("SMH"). DYLEWSKI and Dr. DAVENPORT are cardiac electrophysiologists ("EP" or "EPs") and Dr. DAVENPORT is a board certified cardiologist.

121.    Through Dr. DAVENPORT's daily contact at SMH, he personally observed DYLEWSKI engage in a constant pattern of healthcare fraud. DYLEWSKI and Dr. DAVENPORT shared the same SMH Cath Lab where they performed EP arrhythmia procedures on their patients. Dr. DAVENPORT observed daily DYLEWSKI's unlawful medical and billing practices. Also, while serving as a member of the Quality Assurance Committee at SMH, Dr. DAVENPORT reviewed patient charts which included patient billing information of DYLEWSKI patients and Dr. DAVENPORT has personal knowledge of DYLEWSKI's fraudulent conduct and fraudulent billing practices.

122.    There were three (3) other EP physicians working at SMH, as well as Dr. DAVENPORT who all observed on a daily basis that DYLEWSKI was performing multiple procedures on patients that were not medically indicated and were not medically required. The three other EPs and Dr. DAVENPORT would perform single EP procedures on patients and the cases would be completed. DYLEWSKI would constantly perform at least two-to-three additional procedures on patients which all led to the same conclusion as the initial evaluation. Dr. DAVENPORT has personal knowledge and observed on a daily basis between 2007 and 2014 the intentional fraudulent medical practices of DYLEWSKI.

123.   In   2006–2007,   when   Dr.   DAVENPORT   practiced   medicine   as   an electrophysiologist at the South Miami Heart Center with DYLEWSKI, on occasions when he would ask DYLEWSKI why he was doing additional arrhythmia procedures, e.g., doing an EP study followed by implanting a defibrillator if he was going to implant the defibrillator anyway, therefore the EP study was of no value, DYLEWSKI responded "that he had to pay the bills." After 2008, when Dr. DAVENPORT left his employment with DYLEWSKI, he continued to work in the same Cath Lab at SMH. Dr. DAVENPORT between 2008 and 2014, shared the same operating room facilities and has knowledge of the excessive volume of arrhythmia medical procedures performed by DYLEWSKI because he had to schedule his surgical procedures utilizing the same two Cath Lab operating rooms utilized by DYLEWSKI.

124.   As a respected SMH EP physician, Dr. DAVENPORT maintained a good relationship with all of the Cath Lab employees including medical technicians, Cath Lab nurses, and EP technicians. South Miami Heart Center employees including Rolando Marino (head EP technician), Kevin Nichols, RN (flow nurse), Ray Howard, (EP technician), Victor Zamorano, RN, and Nurse Marinda Naulan, as well as other Cath Lab employees spoke with Dr. DAVENPORT on numerous occasions complaining about the medically unnecessary and not clinically indicated arrhythmia procedures performed by DYLEWSKI on his patients on a daily basis which put the patients at risk for medical complications.

125.   More importantly, in addition to these employees of Defendant, SMH, witnessing DYLEWSKI doing medically unnecessary procedures, they all complained to Carol Biggs thereby informing the administration of DYLEWSKI's constant fraudulent medical practices.

126.    On more than six (6) occasions, Carol Biggs, Chief Administrator at South Miami Heart Center, spoke to Dr. DAVENPORT, questioned the conduct of DYLEWSKI, and voiced her concerns about the performance of unnecessary medical procedures by DYLEWSKI.

127.    Carol Biggs on several occasions called Dr. DAVENPORT into her office to ask him about whether DYLEWSKI was performing unnecessary arrhythmia procedures such as changing new pacemakers for another company's new pacemaker, performing an extraordinarily high volume of AV Optimization procedures, doing EP studies where not clinically indicated, and other arrhythmia procedures.  Ms. Biggs stated on several occasions that her questions to Dr. DAVENPORT were necessitated because Cath Lab technicians and nurses were questioning and complaining about DYLEWSKI performing medically unnecessary and medically unindicated arrhythmia procedures.  On each occasion Dr. DAVENPORT told Ms. Biggs that the procedures were indeed medically unnecessary and she stated that she wanted to hear about it and be informed. Ms. Biggs indicated that she had reported these matters to administration officials at Defendants, SMH, BAPTIST HOSPITAL, and BAPTIST HEALTH. At the conclusion of at least one of Dr. DAVENPORT's  meetings with Ms. Biggs she stated that she would "take it up the chain of command" to BAPTIST HEALTH CEO, Wayne Brackin, as she knew the procedures being performed by DYLEWSKI were wrong and she wanted to try to do something about it.

128.    Between 2008 and 2014, there were five (5) EP physicians at the SMH Cath Lab including DYLEWSKI and Dr. DAVENPORT.  The three other EP physicians, Dr. Hakop Hrachian, Dr. Giancarlo Speziani and Dr. Ellie Haddad, constantly complained about the medically unnecessary procedures being performed by DYLEWSKI on a daily basis. Ultimately, the EP physicians and Cath Lab nurses and technicians would flag medical

procedures performed by DYLEWSKI to note that the procedures in question were not medically indicated.

129.   Dr. DAVENPORT was also a member of the SMH EP Service Line Committee. DYLEWSKI was the chairman of the committee and his procedures were constantly getting flagged as medically unnecessary procedures. Other EPs that were on the committee were Dr. Speziani, Dr. Hrachian and Dr. Haddad.  Dr. Speziani and Dr. Hrachian forced the dissolution of the committee because DYLEWSKI's cases kept getting flagged and he was the chair of the committee so he wouldn't let his cases be reviewed by the committee. The EP doctors on the committee all agreed that DYLEWSKI was performing medically unnecessary procedures.  The results of the SMH EP Service Line committee were supposed to go to the CCSL Committee but DYLEWSKI's cases would not make it there because he was the chair of the committee.  Dr. Speziani and Dr. Hrachian went to the CCSL Committee and stated that they were dissolving their committee because they no longer felt comfortable reviewing DYLEWSKI's cases because nothing was being accomplished. Dr. Speziani and Dr. Hrachian also complained to Carol Biggs and advised that they were dissolving the committee due to the need to have DYLEWSKI's unnecessary medical procedures reviewed and no progress was ever made because he was the chairman of the committee.

130.   On a regular basis, Dr. DAVENPORT, Dr. Hrachian, Dr. Speziani, and Dr. Haddad would discuss the fact that a large percentage of the EP procedures recommended and performed by DYLEWSKI were fraudulent in nature, based upon false information included by DYLEWSKI in patient charts, involved a high volume of patient procedures that were not medically indicated and of no medical value to the patient, and were putting the patients at risk of complications and infections.

131.    Dr. DAVENPORT states that in his years as a resident physician, board certified cardiologist practicing EP procedures in Philadelphia, PA, and his years as a practicing EP at South Miami Heart Center, he has never seen any other EP physician perform medically unnecessary procedures on a routine and regular basis like DYLEWSKI. Dr. DAVENPORT has never witnessed another EP recommending arrhythmia procedures, EP studies, AV Optimizations, and pacemaker changes that were not clinically indicated as was regularly done by DYLEWSKI.

132.    Dr. DAVENPORT observed that between 2008 and 2014 almost every single patient that DYLEWSKI treated would have two to three additional procedures performed that were not medically necessary, not clinically indicated, and put the patients at risk of harm and medical complications. Dr. DAVENPORT has personal knowledge that the HOSPITAL DEFENDANTS and DYLEWSKI submitted to federal healthcare programs false claims for payment.

133.    Dr. DAVENPORT recalls that a SMH medical hospitalist, Dr. Raj Cheruku, complained constantly about the medically unnecessary procedures constantly being performed by DYLEWSKI that were being billed to federal healthcare programs involving elderly and infirmed patients in which DYLEWSKI recommended and performed arrhythmia procedures that were not medically indicated. Dr. DAVENPORT recalls that Dr. Cheruku made the comment that DYLEWSKI in treating his patients "would turn the patients upside down and shake the patients until every last nickel fell out of their pockets and then discharge them."

134.    Dr. DAVENPORT has personal knowledge that, on a routine and regular basis, Defendants, DYLEWSKI, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH submitted claims to federal healthcare programs that were known to be false or fraudulent based upon false

information inserted into the patient medical charts by DYLEWSKI, as well as his routine practice of recommending EP procedures that were not medically indicated including the implantation of electrical devices including AICDs, cardiac resynchronization therapy procedures, pacemakers, device battery/generator change procedures, EP studies, head upright tilt tests, and AV Optimization procedures that were not medically necessary, of no medical benefit to the patient, and/or not clinically indicated. Examples for these false claims are described in ¶¶ 172 - 178 of the SAC.

135.   Dr. DAVENPORT has personal knowledge that representatives, agents and employees of Defendants, SMH, BAPTIST HOSPITAL and BAPTIST HEALTH had full knowledge of (1) the extraordinarily high volume of AV Optimization procedures performed by DYLEWSKI that were not medically indicated; (2) the ongoing practices of DYLEWSKI in dictating into patient charts false or fraudulent information about the condition of his patients and thereafter submitting forms to federal healthcare programs for payment; (3) that DYLEWSKI, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH submitted false claims to federal healthcare programs for Medicare patients who he performed EP procedures and implantation of electrical devices including AICDs, cardiac resynchronization therapy, pacemakers, device battery/generator changes, EP studies and AV Optimizations where there was no clinical indication for the procedures; (4) that DYLEWSKI, on a regular and routine basis, in a patient with an ejection fraction greater than 50% would perform an unnecessary procedure solely for the purpose of generating revenue and submitted claims to federal healthcare programs that were knowingly false and fraudulent; and (5) that Defendants, DYLEWSKI, BAPTIST HOSPITAL and BAPTIST HEALTH, submitted for payment to federal healthcare programs DYLEWSKI

medical procedure claims that were known to them to be not medically required, false, fraudulent and improper claims which were submitted to federal healthcare programs for payment.

136.    Dr. DAVENPORT, while serving on the SMH EP Service Line Committee would receive a packet of medical information involving many cases of DYLEWSKI which would include a face sheet identifying the name, patient identification number, date of service, type of insurance provided including federal healthcare program coverage, and description of services performed, as well as medical charts of  DYLEWSKI patients. Dr. DAVENPORT and the three (3) other EP physicians on the committee unanimously agreed that the medical charts indicated that DYLEWSKI performed EP procedures that were not medically indicated and of no medical value to the patients and thereafter submitted claims for payment to federal healthcare programs for not medically indicated arrhythmia procedures.  Dr. DAVENPORT and the three (3) other EP committee members reported this information to Carol Biggs and other SMH, BAPTIST HOSPITAL and BAPTIST HEALTH representatives and no action was taken by any of them.

137.    Dr. DAVENPORT has personal knowledge as the result of his service on the SMH EP Service Line Committee and reviewing the billing information and medical charts that SMH, BAPTIST HOSPITAL and BAPTIST HEALTH submitted false and/or fraudulent claims to federal healthcare programs for unnecessary medical procedures performed by DYLEWSKI.[8]

138.    Dr. DAVENPORT has personal knowledge of Patient No. 1 identified in ¶ 172 of the SAC and state that the only indication to perform this type of operation on a patient is if the heart muscle is working at 35% or less capacity. There is absolutely never an indication to

---

[8] The SMH EP Service Line Committee, was a peer review committee and any and all documents provided during those committee meetings were prohibited from being removed from the meeting room at any time including at the conclusion of the meetings.  Other than by breaching his duties and stealing the documents, Dr. DAVENPORT did not have any avenue to properly obtain the documented evidence of the Defendants' fraudulent conduct reviewed and discussed during committee meetings.

operate on a patient like Patient No. 1 if the Ejection Fraction (EF) is more than 35%.  Neither Patient No. 1 nor Patient No. 2, according to each medical chart, had a heart muscle working at less than 3 35% or less. Both cases, Patients No. 1 and No. 2 were not medically indicated.  Dr. DAVENPORT has personal knowledge that these fraudulent claims were submitted to Medicare by DYLEWSKI and SMH, BAPTIST HOSPITAL and BAPTIST HEALTH.

139.   Dr. DAVENPORT has personal knowledge that Patient No. 3 was a blatant misrepresentation of facts by DYLEWSKI.  He took an 85-year old demented man, who was bedridden, and falsely stated that the man was quite active and was fainting.  This is an absolute fabrication. Despite the dire medical condition of 85-year old Patient No. 3, DYLEWSKI commenced an EP workup to evaluate him for syncope (fainting), which led to the patient's death.  This is an additional case of a fraudulent submission of a false claim to Medicare by DYLEWSKI, SMH, BAPTIST HOSPITAL and BAPTIST HEALTH.

140.   Dr. DAVENPORT has personal knowledge of reviewing Patient No. 4 in which DYLEWSKI placed an AICD in the patient and then removed it for a medically unindicated reason, then implanted another AICD in the patient.  Three (3) operations in total.  An AICD is only indicated in a patient with a weak heart muscle as stated above (with EF of 35% or less) or a survivor of sudden cardiac death.  Patient No. 4's heart muscle was not weak enough for any of the three (3) surgeries performed by DYLEWSKI. This is another case of a fraudulent submission of a false claim to Medicare by DYLEWSKI, SMH, BAPTIST HOSPITAL and BAPTIST HEALTH.

141.   Dr. DAVENPORT has personal knowledge of Patient No. 5 and states that there was no medical indication for the placement of an AICD.  Additionally, the medical chart reveals that the heart function of the patient was not 35% or less.  DYLEWSKI's billing a federal

healthcare program for this procedure is a fraudulent practice.  The reason is that it clearly is a medically unnecessary procedure and DYLEWSKI knew it.  The reason for his submission of the claim was solely to generate revenue.

142.   Dr. DAVENPORT has personal knowledge of Patient No. 6 and that that there was no medical indication for the placement of an AICD.  Additionally, the medical chart reveals that the heart function of the patient was not 35% or less. This is an additional case of a fraudulent submission of a false claim to Medicare by DYLEWSKI, SMH, BAPTIST HOSPITAL and BAPTIST HEALTH.

143.   Dr. DAVENPORT has personal knowledge that DYLEWSKI, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH submitted for payment to federal healthcare programs the cases described in Patients 1 through 7 in the Second Amended Complaint.  Dr. DAVENPORT has personal knowledge that all seven (7) cases were not medically indicated as described above and were false claims submitted for payment to federal healthcare programs. Dr. DAVENPORT has personal knowledge that DYLEWSKI performed medically unnecessary AV Optimization procedures, and BAPTIST HOSPITAL and SMH knew that DYLEWSKI's volume of those procedures was "5 standard deviations above" the rest of the country. The administration at Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH had been aware of this matter for years and had chosen to take no action.

144.   Dr. DAVENPORT has personal knowledge that SMH, BAPTIST HOSPITAL, and BAPTIST HEALTH ignored constant pleas from physicians and staff to correct and/or stop the conduct of DYLEWSKI and knew that DYLEWSKI was upcoding and performing medical procedures that were not indicated. No action was ever taken by Defendants, SMH, BAPTIST HOSPITAL or BAPTIST HEALTH and the reason that no action was taken is because

DYLEWSKI was a high volume medical provider generating the most revenue as an electrophysiologist at BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH.

**III.** **Stark Law Violations**

145.    Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the Stark Statute or Stark Law) prohibits a hospital from submitting Medicare claims for designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital, and prohibits Medicare from paying any such claims.   The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis."   42 C.F.R. § 411.353 (2006).

146.    The Stark Statute establishes the clear rule that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers.   The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

147.    The Stark Statute prohibits a hospital from submitting a claim to Medicare for "designated health services" that were referred to the hospital by a physician with whom the hospital has a "financial relationship" unless a statutory exception applies.   "Designated health services including inpatient and outpatient hospital services.   42 U.S.C. § 1395nn(h)(6).

148.    Moreover, the Stark Statute provides that Medicare will not pay for designated health services billed by a hospital when the designated health services resulted from a prohibited referral under subsection (a). 42 U.S.C. § 1395nn(g)(1).

149.   "Financial relationship" includes a "compensation arrangement" which means any arrangement involving any remuneration paid directly or indirectly to a referring physician. 42 U.S.C. § 1395nn(h)(1)(A) and (h)(1)(B).

150.   The Stark Statute and regulations contain exceptions for certain compensation arrangements.  These exceptions include, among others, "bona fide employment relationships" and "personal services arrangements."

151.   In order to qualify for the Stark Statute's exception for bona fide employment relationships, compensation arrangements must meet, inter alia, the following statutory requirements: (A) the amount of the remuneration is fair market value and not based on the value or volume of referrals, and (B) the remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital. 42 U.S.C. § 1395nn(e)(2)(B) and (e)(2)(C).

152.   Defendant, DYLEWSKI has had a financial relationship with Defendants, BAPTIST HEALTH and SMH, beginning on or about 2007 when he obtained a $10 Million Dollar donation for the benefit of the Defendants, BAPTIST HEALTH and SMH.  Moreover, at or about the same time, DYLEWSKI moved his practice of performing procedures on patients exclusively to Defendant, SMH and other hospitals of the Defendant, BAPTIST HEALTH.

153.   In further violation of the Stark Statute, as an inducement or reward for obtaining the largest donation Defendants, BAPTIST HEALTH and SMH had received, Defendant, DYLEWSKI, was hired as the Medical Director of the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology at an annual salary of $250,000.  His appointment as Medical Director had no end date and his annual compensation at $250,000 was four (4) to six (6) times higher than the fair market value for other Medical Director positions.

154.    DYLEWSKI failed to maintain any logs or time records to document his time and services as Medical Director.   Moreover, the Cath Lab employees at Defendant, SMH continuously complained that DYLEWSKI failed to provide them any training or education as the Medical Director.

155.    DYLEWSKI and Defendants, BAPTIST HEALTH and SMH entered into a compensation arrangement in violation of the Stark Statute, specifically by paying DYLEWSKI under contracts that exceeded fair market value, were not commercially reasonable and which took into account the volume or value of the referrals or the donations generated by DYLEWSKI.   DYLEWSKI and Defendants, BAPTIST HEALTH and SMH submitted and caused to submit false and fraudulent claims for payment to Medicare which included claims relating to inpatient and outpatient designated health services rendered to patients who were referred to the HOSPITAL DEFENDANTS by DYLEWSKI who had an improper contract which violated the Stark Statute.   DYLEWSKI's contract does not fall within the "bona fide employment" exception to the Stark Statute because the compensation paid to him is not within fair market value and is not commercially reasonable.

156.    Defendants submit claims for all goods and services that are provided to patients who are beneficiaries of federally-funded health care programs including:

a)  For  years,    DYLEWSKI  and  BAPTIST  HEALTH,  BAPTIST HOSPITAL, and SMH submitted Hospital Cost Reports (Form 2552) and falsely certified that medical procedures and health care services performed by DYLEWSKI were medically necessary; and

b)  For  years,  DYLEWSKI  and  BAPTIST  HEALTH,  BAPTIST HOSPITAL, and SMH submitted Health Insurance Claim Forms (Form CMS 1500) and falsely certified that the medical case and services for his patients were medically indicated and necessary.

157.     Relators, Dr. BURKS and Dr. DAVENPORT have personal knowledge, and have reason to know as a result of their daily interaction and duties as physicians at Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, and as members of advisory board and peer review committees evaluating Defendant, DYLEWSKI, during which Relators reviewed patient charts and patient billing records, as well as their personal involvement with patient care, and conversations with others physicians, nurses, and staff, that millions of dollars in claims were submitted to the federal government for improper, unnecessary, and excessive medical procedures, such as those procedures which are described in more detail in paragraphs 172-178 and in the sections below.

158.     Moreover, as demonstrated by the facts set forth in the SAC, Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, have knowledge of the pattern and practice of Defendant, DYLEWSKI, performing improper, unnecessary, and excessive medical procedures that were of no medical value, not clinically indicated, based on false information dictated into patient medical charts by DYLEWSKI, incompatible with the standards of acceptable medical care, and therefore not payable by Medicare, Medicaid, or TRICARE/CHAMPUS. At a minimum, each of the Defendants "act[ed] in reckless disregard of the truth or falsity" of the representations about medical necessity that were presented to the federal government, not to mention the reckless disregard for the health, welfare and safety of their patients. These fraudulent practices have taken place for almost a decade.

159.     Relators, Dr. BURKS and Dr. DAVENPORT also have personal knowledge and have reason to know that when widespread and official quality assurance complaints made against Defendant, DYLEWSKI regarding his unethical procedures, failure to follow proper medical indications and protocols, and his performance of arrhythmia procedures were

investigated by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, no remedial action was taken against Defendant, DYLEWSKI, in order to correct this fraudulent conduct. Defendant, DYLEWSKI was the subject of reviews and evaluations for quality assurance by the South Miami Heart Center Advisory Board Committee repeatedly for several years related to multiple issues with his performance and improper patient care, including the fact the Defendant, DYLEWSKI had the highest dollar volume of all of the electrophysiologists at the South Miami Heart Center while submitting false claims for payment to federal healthcare programs.

160.    Not only was no remedial action taken by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and/or SMH, but Defendant, DYLEWSKI, was actually rewarded for referring patients and performing excessive, unnecessary and not medically indicated procedures. Relators, Dr. BURKS and Dr. DAVENPORT have personal knowledge and have reason to know that the "financial relationship" between Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and/or SMH, and Defendant, DYLEWSKI, is a prohibited financial relationship in violation of the Stark Statute.

161.    Defendant, DYLEWSKI, did not provide any identifiable services in his position as Medical Director of the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology.  He was paid an excessive compensation; submitted false or incomplete time records that contained exaggerated time descriptions of time devoted to work performed as Medical Director and numerous SMH physicians and Cath Lab technicians attest that DYLEWSKI performed no services of any value for the well paid position that he never fulfilled.

162.    The amount of $250,000 paid by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and/or SMH to Defendant, DYLEWSKI, as his annual salary for his position as Medical Director of the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology

53

is not consistent with the fair market value of similar medical director positions nor with the value of the services provided by DYLEWSKI in his position as Medical Director. DYLEWSKI failed to maintain any logs or time records that are commonly maintained by a Medical Director of a charitable foundation in order to document his time devoted to the Weeks Center annually.

163.    The fair market value of annual salaries for similar Medical Director positions are in the range of $20,000 to $50,000.  These positions require keeping diligent and accurate logs of all services provided by the medical director, all journals and studies reviewed and studied, provide training and supervision of other physicians and staff, along with other duties and responsibilities.

164.    In addition to the fact that his $250,000 annual salary as Medical Director is at least five times higher than the fair market value of similar Medical Director positions, Defendant, DYLEWSKI, did not provide any identifiable services and failed to fulfill the duties and responsibilities of similar Medical Director positions.

165.    In the meantime, Form UB-4s, Form UB-92s, and CMS 1500 submitted by the Defendants, BAPTIST HOSPITAL and SMH, falsely represented that money was owed to Defendants for claims that the Defendants knew were based on medically unnecessary and improperly performed medical procedures. Those forms also contained knowingly false certifications that Defendants were in compliance with applicable laws and regulations including the Stark Statute, when in fact Defendants knew they were not in compliance including the duty to maintain an effective peer review program and the fundamental duty to repay any known payments for medically unnecessary procedures.

166.    The truthfulness of those certifications was a prerequisite to receipt of payment from the government for these claims.

167.    As a result of Defendants, BAPTIST HEALTH's, BAPTIST HOSPITAL's, and SMH's inaction, Defendant, DYLEWSKI, has been permitted to continue performing medically unnecessary and excessive procedures – for his own financial benefit and to the continued financial benefit of Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, and to the continued detriment of the federal government and many unsuspecting vulnerable patients.

**IV.    Examples of Medically Unnecessary and Not Clinically Indicated DYLEWSKI Procedures**

168.    Defendant, Dr. DYLEWSKI was motivated to have patients undergo excessive and non-medically indicated procedures in order to meet or exceed his productivity levels as measured by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, and justify his position and corresponding salary.   Defendant, DYLEWSKI, was allowed to continue his performance of unnecessary procedures and related fraudulent billing as a result of the Defendants illegal referral arrangement designed to unjustly enrich the Defendant, DYLEWSKI, in exchange for the millions of dollars donated to Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, from Defendant, DYLEWSKI's, patient to establish and fund the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology.   This arrangement between Defendant, DYLEWSKI, and Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, violated the Stark Law.

169.    In furtherance of their scheme, Defendant, DYLEWSKI, was allowed to read patients' ECHO's, although he was not on the authorized panel of readers at any of Defendant, BAPTIST HEALTH facilities including Defendants, BAPTIST HOSPITAL or SMH. Defendant, DYLEWSKI, was permitted to do so in order to subsequently prescribe and perform

additional invasive procedures which were excessive, medically unnecessary and were not medically required but served to generate fraudulent bills to Medicare, the payments of which were then received and enjoyed by Defendants.

170.    The medical charts and billing records pertaining to Patients 1 through 7 (¶¶ 172-178), clearly identify details of the DYLEWSKI false claims and the presentment of those fraudulent claims to the government for payment by DYLEWSKI and the HOSPITAL DEFENDANTS. During the months of medical committee reviews performed by DR. BURKS' committees and DR. DAVENPORT's committee, the medical charts and billing records were reviewed and then, at the end of each meeting, collected by a hospital representative and the Relators had no opportunity to remove any of the printed materials from the meeting rooms. Clearly, Relators were "without avenues for obtaining information" related to DYLEWSKI's nor the HOSPITAL DEFENDANTS' billing practices.   All of the documents related to DYLEWSKI's fraudulent medical practices and the HOSPITAL DEFENDANTS' knowledge and failure to act which support all of the allegations stated in the SAC are in the exclusive possession of the Defendants.[9]

171.    Additional detail is provided below for select, representative incidents of medically unnecessary procedures, excessive procedures, procedures not medically required, or procedures which caused serious injury to patients by Defendant DYLEWSKI.

---

[9] These documents are currently maintained by the HOSPITAL DEFENDANTS in electronic format, are readily available and any cost to download the documents to disks or a flash drive are nominal. At least some, if not all, of the documents have also been identified in both DYLEWSKI's and the HOSPITAL DEFENDANTS' Initial Disclosures as being in the possession of the HOSPITAL DEFENDANTS. All of the medical charts and billing records described in ¶ 172 - 178 of the SAC are contained in the documents in the possession of the HOSPITAL DEFENDANTS.

172.   **Patient No. 1**: As recently as May 2014, an 80 year old female patient underwent three (3) unnecessary procedures before the medically indicated procedure was performed. Specifically, the elderly woman was admitted to Doctors Hospital after two witnessed episodes of fainting – syncope – and was placed on telemetry.  Telemetry revealed a heart block, slow rhythm and bradycardia, indicating a pacemaker was medically necessary as determined by the consulting cardiologist. Nevertheless, Defendant, DYLEWSKI, had the elderly patient transferred to Defendant, SMH, and had her undergo a Head Upright Tilt Table Study, a transesophageal echocardiogram, and an electrophysiology study. After undergoing these three (3) unnecessary, excessive and non-medically indicated procedures, Defendant, DYLEWSKI, implanted the pacemaker which was the only procedure that was medically indicated from the outset.

173.   **Patient No. 2**: An 80 year old male patient with multiple comorbidities and chronic kidney disease was treated by Defendant, DYLEWSKI, who "upgraded" his pacemaker to a biventricular pacemaker using excessive amounts of iodinated contrast.  The patient suffered renal failure, dialysis, and eventual death.  A review of pre-procedure medical records failed to reveal any indication for the "upgrade" pacemaker procedure and the patient's ECHO demonstrated an EF greater than 40%.

174.   **Patient No. 3**: Again, Defendant, DYLEWSKI, evaluated a 70 year old male patient who presented with multiple comorbidities and chronic kidney disease and recommended and performed a pacemaker "upgrade."  Similar to Patient No. 2 above, the procedure was not medically indicated and performed unnecessarily and improperly, with the same unfortunate results as Patient 2 above.  These patients underwent these procedures which not only were of no medical value but their deaths were directly and causally related to these unnecessary and

improperly performed procedures.  However, as a result of Defendant, DYLEWSKI, subjecting Patient No. 2 and No. 3 to general anesthesia and a sham surgical procedure, Defendant, DYLEWSKI, submitted bills to Medicare, causing Medicare to also be billed for the anesthesiologist's fees, facility fees and other fees related to the procedure.

175.    **Patient No. 4**: An 85 year old male patient with severe coronary artery disease, peripheral artery disease, and chronic kidney disease presented at Defendant, SMH. Although his prior medical records reflected that he was demented and non-ambulatory, Defendant, DYLEWSKI, evaluated this patient and documented him to be in good health and "very active." Defendant, DYLEWSKI, then planned to investigate the patient for syncope although, again, the patient's records reflect that he was unable to get out of bed.  Defendant, DYLEWSKI, also planned an EP study and consulted an interventional cardiologist and requested a cardiac catherization be done prior to the proposed EP study.  The cardiac catherization led to iliac dissection requiring multiple stents, renal failure and the patient's subsequent death.  Defendant, DYLEWSKI's, workup and proposed EP study had no clinical benefit or medical value for this patient and demonstrates the Defendants reckless disregard for the health, welfare and safety of their patients.

176.    **Patient No. 5**:  A 65 year old male patient with congestive heart failure and a previously implanted pacemaker was evaluated by Defendant, DYLEWSKI.  As a result of Defendant, DYLEWSKI's, evaluation, he replaced the pacemaker with an AICD because allegedly the patient's EF is 25%.  Subsequently, the patient was re-evaluated because the AICD was found to be non-functional for unidentified reasons.  Defendant, DYLEWSKI, documented that the device was defective and removed and replaced the AICD and both leads with a new AICD and leads.  The removed AICD and leads were returned to the manufacturer for evaluation

58

where it was determined to be completely functional.  Upon further review of this patient's records by the ad hoc committee of the South Miami Heart Center Advisory Board, the patient's pre-operative ECHO which had been read by Defendant, DYLEWSKI, showed an EF between 40% to 50% providing no indication for the initial removal of his existing pacemaker and replacement with the AICD.  Further, it was determined that any problems with the first AICD was improper lead placement.  However, reimbursement for placement of a new device is significantly higher than for lead adjustment and this financial incentive was identified as the reason for the removal and replacement of the AICD.

177.   **Patient No. 6**:   A 60 year old male patient, who allegedly had a low EF, underwent the removal of his pacemaker which was replaced with an AICD performed by Defendant, DYLEWSKI.  The patient was returned to the lab because it was determined that the AICD was not properly capturing the electrical activity.  Defendant, DYLEWSKI, documented that the leads were "broken" and the patient required a procedure to remove and replace the leads.  The removed leads were returned to the manufacturer for examination and evaluation and were determined to be normal and functional.  In addition to the indication that the problem with the leads was improper placement, it is significant that this patient's pre-operative ECHO reflected an EF greater than 40% providing no indication for removal and replacement of his existing device.  This was another unnecessary surgery resulting in multiple billings for all of the surgical and related equipment and services for the direct benefit of all Defendants, BAPTIST HEALTH, SMH, and DYLEWSKI.

178.   **Patient No. 7**:   An 80 year old female patient's medical records reveal no indication for a removal and replacement of her existing pacemaker.  Yet, Defendant, DYLEWSKI, recommended and performed the removal of her existing device and "upgrade" to

a biventricular pacemaker.    Immediately following this unnecessary surgery, this patient developed a pericardial effusion due to lead perforation.    Fortunately, her post-operative complications were managed appropriately.

179.    The patient cases described in ¶¶ 172 – 178, identify specific facts that indicate actual false claims that were submitted to federal healthcare programs for payment by DYLEWSKI, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH.

180.    The examples described above are just a small sampling of the medically unnecessary, excessive, medically not required procedures and improper fraudulent billing practices implemented by DYLEWSKI, BAPTIST HEALTH, BAPTIST HOSPITAL and SMH, witnessed and known by Relators Dr. BURKS and Dr. DAVENPORT and that Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, have endorsed and allowed to continue. A high percentage, if not all, of Defendant Dr. DYLEWSKI's patients who have undergone these unnecessary procedures are beneficiaries under the Medicare, Medicaid or TRICARE programs. Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, SMH and DYLEWSKI submitted claims to the federal government for payment for the equipment and medical services related to all of these multiple procedures performed on each of those patients.

181.    In addition to Relators' direct and personal knowledge of Defendant DYLEWSKI's pattern and practice of performing medically unnecessary, excessive procedures, and fraudulent billing practices, other physicians, nurses, and staff also have witnessed these practices.

182.    Specifically, physicians have been vocal to the administration at Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, regarding Defendant, DYLEWSKI's, overutilization of AV optimization procedures which have no clinical benefit.    Significantly,

Defendant, DYLEWSKI performed AV optimization procedures at Defendant, SMH at a rate that is 5x standard deviation above any other hospital in the country.  Moreover, the director of the ECHO Department at Defendant, SMH has confirmed that this consistent overutilization is necessary to increase and maintain the volume of laboratory procedures.   Again, no action was taken by Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and/or SMH, to mitigate this overutilization because the volume of procedures allowed them to reaping the benefits of the submission and payment of these fraudulent claims.

183.   Moreover, after being advised directly by Relator, Dr. BURKS and other physicians from different medical disciplines who were also members of the various peer review committees about Defendant, Dr. DYLEWSKI's, fraudulent practices resulting in false claims being submitted to Medicare and other government programs, Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, failed to inform the federal government about the unnecessary surgical procedures they had discovered, and Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, failed to refund to the federal government the payments received for such medically unnecessary procedures.

184.   Relators, Dr. BURKS and Dr. DAVENPORT have direct knowledge that the administration at both Defendants, BAPTIST HEALTH, BAPTIST HOSPITAL, and SMH, knowingly and willingly allowed Defendant, DYLEWSKI, to continue performing unnecessary, excessive, and improper procedures for their own financial benefit and prevented these and more issues from coming to light by failing to retain an outside reviewer to further investigate Defendant, DYLEWSKI's, systemic and continued fraudulent conduct.   Instead, these Defendants intentionally chose to bury their head in the sand despite the strong and consistent recommendations from the peer review committees and medical staff to the contrary.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A) BY PRESENTING CLAIMS TO MEDICARE FOR DESIGNATED HEALTH SERVICES RENDERED AS A RESULT OF VIOLATIONS OF THE STARK STATUTE

185.    Plaintiffs incorporate by reference all paragraphs of the complaint as if fully set forth herein.

186.    This is a claim for refunds, treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

187.    By means of the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the United States including those claims for reimbursement for designated health services rendered to patients who were referred by DYLEWSKI with whom the HOSPITAL DEFENDANTS had entered into a prohibited financial relationship in violation of the Stark Statute.  The United States, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

188.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount and is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### SECOND CAUSE OF ACTION
### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2)
### USE OF FALSE STATEMENTS

189.    Plaintiffs incorporate by reference all paragraphs of the complaint as if fully set forth herein.

190.    Defendants, DYLEWSKI, BAPTIST HOSPITAL and SMH made, used and caused to be made or used, false records or statements, i.e., the false certifications and representations made and caused to be made by Defendants when initially submitting the false claims for interim payments and the false certifications made by the HOSPITAL DEFENDANTS in submitting cost reports to get false or fraudulent claims paid and approved by the United States.

191.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

192.    By means of the acts described above, the United States, unaware of the falsity of the records and statements, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

193.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount, and therefore is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## THIRD CAUSE OF ACTION
## VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(7)
## FALSE RECORD TO AVOID AN OBLIGATION TO REFUND

194.    Plaintiffs incorporate by reference all paragraphs of the complaint as if fully set forth herein.

195.    By means of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements, i.e., the false certifications and representations made and caused to be made by Defendants when initially submitting the false claims for interim payments and the false certifications made by the HOSPITAL

DEFENDANTS in submitting the cost reports in order to get false and fraudulent claims paid and approved by the United States.

196.     Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

197.     By virtue of the false or fraudulent statements made to the government and the concealment by Defendants, the United States has been damaged, and continues to be damaged, in a substantial amount and is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## FOURTH CAUSE OF ACTION
## PAYMENT UNDER MISTAKE OF FACT

198.     Plaintiffs incorporate by reference all paragraphs of the complaint as if fully set forth herein.

199.     This is a claim for the recovery of monies paid by the United States to Defendants (directly or indirectly) as a result of mistaken understandings of fact.

200.     HOSPITAL DEFENDANTS were not entitled to receive payment from the United States for designated health services rendered by any physician who was in a financial relationship prohibited by the Stark Statute.

201.     The United States paid the HOSPITAL DEFENDANTS for designated health services rendered by DYLEWSKI who was in a financial relationship prohibited by the Stark Statute without knowledge of materials facts, and under the mistaken belief that HOSPITAL DEFENDANTS were entitled to receive payment for such claims. The United States' mistaken belief was material to its decision to pay HOSPITAL DEFENDANTS for such claims. Accordingly, HOSPITAL DEFENDANTS are liable to account and pay to the United

States the amounts of the payments made in error to the HOSPITAL DEFENDANTS by the United States.

## FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT

202.    Plaintiffs incorporate by reference all paragraphs of the complaint as if fully set forth herein.

203.    This is a claim for the recovery of monies by which the HOSPITAL DEFENDANTS have been unjustly enriched.

204.    By directly or indirectly obtaining government funds to which they were not entitled, HOSPITAL DEFENDANTS were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## SIXTH CAUSE OF ACTION
### DISGORGEMENT, CONSTRUCTIVE TRUST AND ACCOUNTING

205.    Plaintiffs incorporate by reference all paragraphs of the complaint as if fully set forth herein.

206.    This is a claim for disgorgement of profits earned by the HOSPITAL DEFENDANTS because of excess payments the HOSPITAL DEFENDANTS made to DYLEWSKI.

207.    HOSPITAL DEFENDANTS concealed their illegal activity through false statements, claims and records, and failed to abide by their duty to disclose such information to the United States.

208.    The United States did not detect the HOSPITAL DEFENDANTS' illegal conduct.

209.   This Court has the equitable power to, among other things, order the HOSPITAL DEFENDANTS to disgorge the entire profits they earned from business generated as a result of their violations of the Stark Statute, the common law, and the False Claims Act.

210.   By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by the HOSPITAL DEFENDANTS on referrals from DYLEWSKI to whom it paid excess remuneration, disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States of those profits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs/Relators pray that upon trial or final hearing, the Court enter a final judgment for Plaintiffs/Relators and the United States against Defendants, as follows:

1. For the refund or repayment of all amounts that were billed in violation of the FCA, 31 U.S.C. §§ 3729, *et seq.*;

2. For the refund or repayment of all amounts that were billed in violation of the Stark Law, 42 U.S.C. § 1359nn;

3. For civil penalties of $5,500 to $11,000 for each false claim pursuant to 31 U.S.C. § 3729(a);

4. For three times the amount of damages proved, pursuant to 31 U.S.C. § 3729(a);

5. For civil penalties of not more than $15,000 for each service that was billed in violation of the Stark Law, pursuant to 42 U.S.C. § 1359nn(g)(3);

6. For a civil penalty of not more than $100,000 for each arrangement entered into by the Defendants in violation of the Stark Law, pursuant to 42 U.S.C. § 1359nn(g)(4);

7. For payment by mistake and unjust enrichment, for the damages sustained and/or amounts which the Defendants received in error or by which the Defendants were unjustly enriched, plus interest, costs, and expenses;

8. For disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by the HOSPITAL DEFENDANTS, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal

profits obtained by the HOSPITAL DEFENDANTS and such further equitable relief as may be just and proper;

9.   For costs of court;

10.  For pre-judgment and post-judgment interest at the rates permitted by law;

11.  For such other and further relief as may be appropriate and authorized by law;

12.  Plaintiffs/Relators further pray that they be awarded an appropriate percentage of the amount recovered by and for the United States as a result of this action, together with statutory expenses, plus reasonable attorneys' fees and costs, in accordance with 31 U.S.C. § 3730(d).

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs/Relators demand a trial by jury of all issues so triable as a matter of right.

Dated:  May 9, 2016                    Respectfully submitted,

By: */s/ Tod Aronovitz*
        Tod Aronovitz (FBN 186430)
        ta@aronovitzlaw.com
        Barbara Perez (FBN 989304)
        bp@aronovitzlaw.com
        **ARONOVITZ LAW**
        2 S. Biscayne Boulevard
        Suite 3700 – One Biscayne Tower
        Miami, FL 33131
        305-372-2772 Telephone
        305-397-1886 Facsimile

        Spencer Aronfeld (FBN 905161)
        aronfeld@aronfeld.com
        **ARONFELD TRIAL LAWYERS, P.A.**
        3132 Ponce de Leon Boulevard
        Coral Gables, Florida  33134
        (305) 441-0440 Telephone
        (305) 441-0198  Facsimile

        **Counsel for Plaintiffs/Relators**

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on May 9, 2016 I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel listed on the attached Service List.


By: _____*/s/ Tod Aronovitz*_____

<u>**SERVICE LIST**</u>
**Burks, et al. vs. Dylewski, et al.**
<u>**Case No. 14-civ-22079-Ungaro/Otazo-Reyes**</u>

**Counsel for Plaintiffs/Relators:**

Tod Aronovitz (FBN 186430)
ta@aronovitzlaw.com
Barbara Perez (FBN 989304)
bp@aronovitzlaw.com
ARONOVITZ LAW
One Biscayne Tower, Suite 3700
2 South Biscayne Boulevard
Miami, FL 33131
(305) 372-2772 Telephone
(305) 397-1886 Facsimile

Spencer Aronfeld (FBN 905161)
aronfeld@aronfeld.com
ARONFELD TRIAL LAWYERS, P.A.
3132 Ponce de Leon Boulevard
Coral Gables, Florida  33134
(305) 441-0440 Telephone
(305) 441-0198  Facsimile

**Counsel for USA:**

John C. Spaccarotella
John.Spaccarotella@usdoj.gov
Assistant U.S. Attorney
Southern District of Florida
99 NE 4th Street, Third Floor
Miami, Florida 33132
(305) 961-9212 Telephone

**Counsel for Defendants,**
***Baptist Health South Florida, Inc.***
***d/b/a Baptist Health South Florida,***
***and d/b/a Miami Cardiac &***
***Vascular Institute; Baptist Hospital of***
***Miami, Inc.; and South Miami Hospital,***
***Inc., d/b/a South Miami Heart Center***:

Michael P. Matthews (FBN 63988)
mmatthews@foley.com
FOLEY & LARDNER LLP
100 North Tampa Street, Suite 2700
Tampa, FL 33602-5810
(813) 225-4131 Telephone
(813) 221-4210 Facsimile

Angelica L. Boutwell (FBN 105069)
aboutwell@foley.com
FOLEY & LARDNER LLP
One Biscayne Tower – Suite 1900
2 South Biscayne Boulevard
Miami, Florida 33131
(305) 482-8432 Telephone
(305) 482-8600 Facsimile

**Counsel for Defendant,**
***John R. Dylewski, M.D.:***

Ronald Gainor, Esq. (FBN 606960)
gainorlaw@gmail.com
Amber Donner (FBN 600032)
amber_donner@hotmail.com
GAINOR & DONNER
3250 Mary Street, Suite 405
Miami, Florida 33131
(305) 537-2000 Telephone
(305) 537-2001 Facsimile