UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:14-cv-22079-UU

JAMES A. BURKES, M.D.*, et al.*

    Plaintiffs,

v.

JOHN R. DYLEWSKI, M.D., *et al.*,

    Defendants.
_____/

**ORDER ON MOTIONS TO DISMISS**

THIS CAUSE is before the Court upon Defendants' Motions to Dismiss, D.E. 107 and D.E. 108. The Motions are fully briefed and ripe for disposition.

THE COURT has reviewed the pertinent portions of the record and is otherwise fully advised in the premises. For reasons set forth below, Defendants' Motions are DENIED.

**BACKGROUND**

The following allegations are taken from Plaintiffs' Second Amended Complaint (the "SAC"). D.E. 104.

Plaintiffs, James A. Burkes, M.D. ("Burkes") and James D. Davenport, M.D. ("Davenport"), bring this action under the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA"), and the Stark Law, 42 U.S.C. § 1395nn, *et seq.* Defendant John R. Dylewski, M.D. ("Dylewski") is a treating physician employed by the remaining Defendants, Baptist Health South Florida ("Baptist Health"), Baptist Hospital of Miami ("Baptist Hospital") and South Miami Hospital, Inc. ("SMH") (Baptist Health, Baptist Hospital and SMH shall, collectively, be referred to as the "Baptist Defendants"). The Baptist Defendants are related corporate entities that operate hospital facilities throughout Miami, Florida. Baptist

1

Health operates eight hospitals throughout South Florida, including Baptist Hospital and SMH. D.E. 104 ¶ 30. Baptist Hospital is a Florida not-for-profit corporation currently licensed to maintain 728 hospital beds. *Id.* ¶ 32. SMH is a Florida not-for-profit corporation currently licensed to maintain 452 hospital beds. *Id.* ¶ 34. SMH also houses the South Miami Heart Center, which is a full-service cardiac and vascular care facility. *Id.*

Burkes is a board-certified vascular surgeon and medical doctor licensed to practice in Florida. *Id.* ¶ 21. Since 2009, Burkes has been the Chief of Vascular Surgery at SMH. *Id.* Davenport is a board-certified cardiologist licensed to practice in Florida. *Id.* ¶ 22. Davenport worked in Dylewski's office from 2006 to 2007 and, afterwards, worked as a practicing physician for Baptist Health and SMH. *Id.* ¶¶ 5, 22.

Plaintiffs allege that they have personal knowledge of Dylewski engaging in a number of unnecessary cardiac procedures, including: (1) echocardiograms ("ECHO"); (2) electrophysiologic studies ("EP Study"); (3) Head Upright Tilt Tests; and (4) other treatments of arrhythmia by ablation, cryoablation, or implantation of an electronic device, such as a pacemaker, AIC, Biventricular AICD or Biventricular pacemaker. *Id.* ¶¶ 75-86. Overuse of these procedures results in significantly increased costs to the federal government and significantly increased profits for offending providers. *Id.* ¶ 87. Plaintiffs claim that Dylewski over-utilized these procedures for the sole purpose of increasing the amount of physician and hospital reimbursements paid by Medicare and other federally-funded programs. *Id.* ¶ 85. Plaintiffs further allege that they have personal knowledge of Dylewski's practice of intentionally subjecting patients to multiple unnecessary procedures, based on reviewing materials obtained as a result of Plaintiffs' service on various committees and Plaintiffs' work alongside Dylewski. *Id.* ¶¶ 89-144. Plaintiffs also refer to seven (7) specific examples of

Dylewski subjecting patients to unnecessary procedures and, thereafter, submitting false and fraudulent claims to the federal government. *Id.* ¶¶ 138-144, 172-176.

Plaintiffs allege that the Baptist Defendants actually knew but turned a blind eye to the systemic overutilization of medical procedures and improperly inflated billing practices of Dylewski. *Id.* ¶ 88. Plaintiffs specifically allege that the Baptist Defendants, over a number of years, submitted Hospital Cost Reports (Form 2552), Health Insurance Claim Forms (Form CMS 1500), Form UB-4s, and Form UB-92s, which falsely certified that medical procedures and health services performed by Dylewski were medically necessary. *Id.* ¶¶ 166-166. Plaintiffs also allege that Dylewski was subject to an investigation by the Cardiovascular Clinical Service Line Committee ("CCSL Committee") at the South Miami Heart Center, which discovered that Dylewski performed: (1) significantly higher numbers of AV Optimization procedures than doctors at other hospitals in the United States; (2) unnecessary and inadequately documented AICD and PPM device replacements; and (3) subjected numerous patients to medically unnecessary procedures. *Id.* ¶¶ 90-91, 99. Plaintiffs further allege that in 2013, the CCSL Committee unanimously voted to rescind Dylewski's medical privileges pending an independent review, but that SMH CEO Lincoln Mendez and Baptist Health CEO Wayne Brackin contacted Burke. *Id.* ¶ 109. The CCSL thereafter voted to rescind the suspension of Dylewski's medical privileges due to pressure placed upon its members by Baptist Health administration. *Id.* ¶ 109.

No further action was taken by Defendants. *Id.* ¶ 114. Instead, Dylewski was paid an annual salary of $250,000 as Medical Director of the L. Austin Weeks Heart Rhythm Center and Center for Electrophysiology, which was at least four times higher than the fair market value for similar positions. *Id.* ¶ 153.

On May 9, 2016, Plaintiffs filed the SAC, which alleged six Counts against Defendants. On June 13, 2016, Plaintiffs voluntarily dismissed Counts III, IV, V and VI of the SAC, leaving the following two Counts: violations of Section 3729(a)(1)(A) of the FCA by presenting false or fraudulent claims for payment to the United States (Count I) and violations of Section 3729(a)(1)(B)[1] of the FCA by submitting false certifications and representations to the United States (Count II). D.E. 104, 114. On May 24, 2016, the Baptist Defendants and Dylewski moved to dismiss Plaintiffs' SAC, in its entirety, under Federal Rules of Civil Procedure 12(b)(6) and 9(b). D.E. 107, 108.

## **LEGAL STANDARD**

In order to state a claim, Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." While a court, at this stage of the litigation, must consider the allegations contained in the plaintiff's complaint as true, this rule "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In addition, the complaint's allegations must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

In practice, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[1] While Count II of the SAC refers to 31 U.S.C. § 3729(a)(2), Plaintiffs' allegations in Count II indicate that Plaintiffs bring this Count under 31 U.S.C. § 3729(a)(1)(B), which provides for liability where a party "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim," and not 31 U.S.C. 3729(a)(2), which governs reduction of damages under the FCA based on cooperation with the federal government.

4

misconduct alleged. *Id.* The plausibility standard requires more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Id.* Determining whether a complaint states a plausible claim for relief is a context-specific undertaking that requires the court to draw on its judicial experience and common sense. *Id.* at 679.

Fraud claims are subject to Rule 9(b)'s heightened pleading requirements. Rule 9(b) provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but "[m]alice, intent, knowledge, and other condition of mind of a person shall be averred generally." Fed. R. Civ. P. 9(b). The Eleventh Circuit has stated that Rule 9(b)'s fraud particularity requirement is met as long as the complaint sets forth (1) precisely what representations were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal citation omitted).

## DISCUSSION

### I.   Federal Rule of Civil Procedure 9(b)

A. Pleading Fraud with Particularity

Defendants, once again, move to dismiss Plaintiffs' FCA claims (Counts I and II) on grounds that Plaintiffs failed to plead these claims with the particularity required under Federal Rule of Civil Procedure 9(b). As set forth in the Court's May 3, 2016 Order on Motions to Dismiss, Plaintiffs must "plead the submission of a false claim with particularity." D.E. 101 p. 5;

*U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703-04 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 2379 (2015) (internal citations omitted); *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005). To do so, a relator must allege specific facts to indicate, with indicia of reliability, that "*an actual false claim* for payment" was made to the government. *Mastej*, 591 F. App'x at 704 (emphasis in original). A court evaluates "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Id.*

The Court previously held that Plaintiffs did not plead their FCA claims with the particularity required under Rule 9(b) because Plaintiffs did not: (1) identify any specific false claims submitted to the government; or, alternatively, (2) provide any information whatsoever to indicate that false claims referenced in the First Amended Complaint were actually submitted to the government. D.E. 101 pp. 6-10 (citing *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002), *Mastej*, 591 F. App'x at 703-04, and *U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 972 F. Supp. 2d 1317, 1329 (N.D. Ga. 2013)).

In the SAC, Plaintiffs have alleged sufficient facts to show, with indicia of reliability, that false claims were actually submitted to the government. Specifically, Burkes alleges that he: (1) served as Chief of the CCSL Committee and, in that role, "became a de facto hospital Chief of Cardiology reviewing and [obtained] firsthand knowledge regarding Dylewski's practice of cardio electrophysiology . . . [and] medical and billing practices;" (2) investigated Dylewski's use of numerous procedures, along with the CCSL Committee, and concluded that these procedures were "medically outdated, unnecessary, and not medically indicated," but nonetheless carried out by Dylewski for years with Defendants' knowledge and consent; (3) personally reviewed medical charts and billing records of Dylewski's Medicare patients; and (4)

6

"has personal knowledge that the Defendants submitted for payment to Medicare the cases described as patients 1 through 7 in the SAC." D.E. 104 ¶¶ 89-93, 99, 103, 114, 116.

Davenport alleges that he worked as Dylewski's "colleague and partner" from 2006 to 2007 and as a practicing physician at SMH from 2007 to 2014. *Id.* ¶ 120. Davenport also alleges that it was a member of the SMH EP Service Line Committee (the "SMH Committee") while Dylewski was Chairman of the SMH Committee. *Id.* ¶ 129. In his capacity as a practicing physician and SMH Committee member, Davenport alleges that he "personally observed Dylewski engag[ing] in a constant pattern of healthcare fraud" by "submitting claims to federal healthcare programs that were known to be false or fraudulent based upon false information inserted into the patient medical charts by Dylewski, as well as his routine practice of recommending EP procedures that were not medically indicated." *Id.* ¶¶ 23, 134. Davenport claims to have personal knowledge that each of the seven (7) patients referred to in the SAC were subject to medically unnecessary procedures that were actually and fraudulently submitted to the government "solely to generate revenue." *Id.* ¶¶ 138-144. Davenport also alleges that he personally: (1) "reviewed patient charts which included patient billing information of Dylewski's patients;" and (2) "shared the same operating room facilities" as Dylewski. *Id.* ¶¶ 121, 123, 136-37.

Burkes' and Davenport's allegations are more than enough to demonstrate that Plaintiffs, as relators with "direct, first-hand knowledge of [Dylewski's] submission of false claims gained through [their] employment," have a "sufficient basis for asserting that the defendants actually submitted false claims" to the government. *Mastej*, 591 F. App'x at 704 (citing *U.S. ex rel. Walker v. R & F Props. of Lake County, Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005)).

B. Group Pleading

Defendants also argue that Rule 9(b) does not permit group pleading and Plaintiffs must, at a minimum, "identify the role of each defendant in the alleged fraudulent scheme." D.E. 107 p. 19 (citing *U.S. ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 997-98 (9th Cir. 2011)). The Court previously dismissed Plaintiffs' FAC for failure to satisfy Rule 9(b) because it was "devoid of specific factual allegations with respect to the separate Defendants." D.E. 101 (citing *U.S. ex rel. Graves v. Plaza Med. Ctrs. Corp.*, No. 10-23382-CIV, 2014 WL 5040284, at *2-3 (S.D. Fla. Oct. 8, 2014)).

The SAC fixes this defect. Specifically, Plaintiffs' SAC differentiates between Defendants and, moreover, specifies which employees of each Defendant were on notice of Dylewski's purportedly fraudulent medical and billing practices. D.E. 104 ¶¶ 89, 94-96, 105, 109, 124, 127-130. This is enough to satisfy Rule 9(b), especially given that Plaintiffs do not, at this stage of the litigation, appear to have access to information which would "illuminate the exact relationship" between these entities. *Speir v. Wal-Mart Stores, Inc.*, 2007 WL 707357, at *2 (N.D. Ga. Mar. 1, 2007); *see also U.S. ex rel. Kozhukh v. Constellation Tech. Corp.*, 64 F. Supp. 2d 1239, 1241 (M.D. Fla. 1999).

II. **Whether Plaintiffs Can State a FCA Claim Based on Implied Certification**

Defendants argue that Counts I and II, which are the only remaining Counts in Plaintiffs' SAC, should be dismissed for two additional reasons. First, Defendants argue that Plaintiffs fail to plead, with particularity or otherwise, that Defendants submitted false certifications to the government, and that Plaintiffs cannot state a claim under the FCA based solely on generic certifications on hospital cost report forms. D.E. 107 pp. 16-17. Second, Defendants argue that Plaintiffs cannot state a claim under the FCA based on "improperly performed" medical

8

procedures, as the FCA is not a medical malpractice statute and, therefore, provides no basis to recover based on a defendant's implied certification with contractual and statutory duties, such as the duty to properly perform medical procedures. D.E. 107 p. 20. With respect to this second argument, Defendants contend that "while there is a circuit split as to whether implied false certification is a viable theory and whether the state and regulation at issue must state that compliance with it is a condition of payment . . . federal medical malpractice claims cannot be asserted under *any* possible formulation of implied false certification that has ever been articulated by *any* court." *Id.* pp. 20-21 (emphasis in original).

In response, Plaintiffs argue, in relevant part, that the SAC adequately alleges that Defendants violated the FCA because it alleges that Dylewski performed "medically unnecessary and not medically indicated procedures" at Baptist Hospital and SMH, "who in turn submitted claims for facilities and other fees related to these procedures," even though "Baptist Hospital and SMH knew these procedures were fraudulent." D.E. 116 pp. 12-13. Plaintiffs argue that these allegations are enough to show that Defendants "knowingly caused the submission of materially false or fraudulent claims in violation of the FCA." *See id.* p. 13.

The Court agrees with Plaintiffs. As an initial matter, the Court has already rejected Defendants' argument that Plaintiffs cannot state a claim for violation of the FCA based on unnecessary or improper medical procedures, as long as such claims are otherwise permissible under the FCA. D.E. 101 pp. 10-11. Accordingly, the question here is whether Plaintiffs state a claim under the FCA where Defendants allegedly falsely certified compliance with "laws and regulations regarding the provision of health care services" when Defendants submitted claims for reimbursement to the government for Dylewski's allegedly unnecessary and not medically indicated procedures. D.E. 104 ¶ 53. While the Court previously refrained from ruling on this

9

issue in light of the U.S. Supreme Court's then-pending decision in *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989 (2016), the Court now considers the issue in light of the U.S. Supreme Court's June 16, 2016 ruling in *Universal Health Services*.

In *Universal Health Services*, the U.S. Supreme Court held that "at least in certain circumstances, the implied false certification theory can be a basis for [FCA] liability." *Id.* at 1995. More specifically, the Court explained that liability can attach where "the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement," as long as failure to disclose this noncompliance is "material to the Government's payment decision." *Id.* at 1995-96. Noncompliance with a specific statute, regulation or contractual requirement may be "material," even if those requirements were not expressly designated as conditions of payment. *Id.* at 1995, 2001 ("Whether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry."). Under the FCA and the U.S. Supreme Court's decision, a requirement is "material" if it has a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at 2002 (citing 31 U.S.C. § 3729(b)(4)). Nonetheless, a defendant's failure to comply with a particular statutory, regulatory or contractual requirement is not material just because: (1) "the Government designates compliance . . . as a condition or payment;" or (2) "the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 2003.

Here, Plaintiffs allege that Dylewski performed medically unnecessary and not medically indicated procedures and "dictat[ed] into patient charts false or fraudulent information about the condition of his patients" with the intent and effect of "improperly inflat[ing]" claims submitted

to Medicare and other federally-funded health programs. *See, e.g.*, D.E. 104 ¶¶ 88, 135. Plaintiffs allege that Dylewski's actions put "patients at great risk of complications, including infections, heart perforations, and death because of the risks associated with these serious cardiac procedures and also related to undergoing general anesthesia." *Id.* ¶¶ 8, 130. Plaintiffs also allege that agents of the Baptist Defendants submitted Hospital Cost Reports, which were designated Form 2552, and in these reports certified that "the services identified in [the cost reports] were provided in compliance with such laws and regulations [regarding the provision of healthcare services." *Id.* ¶ 53. Plaintiffs further allege that the Baptist Defendants must have submitted CMS 1500 forms "[i]n order to get paid from Medicare" and, in these forms, certified that "services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations." *Id.* ¶ 56.

Under these circumstances, Defendants are subject to potential liability under the FCA on two separate grounds. First, Plaintiffs allege that Defendants made specific representations to the government on the CMS 1500 forms that procedures performed by Dylewski "were medically indicated and necessary for the health of the patient." *Id.* If Dylewski's procedures were not "medically indicated and necessary for the health of the patient," Defendants' false statements on the CMS 1500 forms are actionable under the FCA. *See U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006) ("So long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach."); *see also U.S. ex rel. Roy v. Anthony*, 914 F. Supp. 1504, 1506 (S.D. Ohio 1994) ("In the context of Medicare, a false claim might occur

where a doctor submits a Medicare claim form for a procedure that was never performed or routinely performs unnecessary medical procedures for the sole purpose of billing Medicare.").

Second, Defendants are potentially liable, under *Universal Health Services*, based on a theory of implied certification because Defendants submitted claims for payment that made "specific representations about the goods or services provided," namely that Dylewski's procedures were "medically indicated and necessary for the health of the patient," while "knowingly fail[ing] to disclose [Defendants'] noncompliance with a statutory, regulatory, or contractual requirement." D.E. 104 ¶ 56; *Universal Health Services*, 136 S. Ct. at 1995. These alleged non-disclosures were in all likelihood material to the government's decision to tender payment under Medicare because the government would have a "natural tendency" to be influenced by repeated and widespread inflation of Medicare payments as a result of medically unnecessary and not medically indicated procedures. *See id.* at 2002; *see also U.S. ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 799 (11th Cir. 2014) (suggesting that a viable FCA claim exists where "physicians either expressly certified or, through their participation in a federally funded program, impliedly certified their compliance with" the relevant federal law). For these reasons, Plaintiffs' SAC states a claim under the FCA in Counts I and II.[2]  Accordingly, it is

ORDERED AND ADJUDGED that Defendants' Motions, D.E. 107 and D.E. 108, are DENIED.  Defendants SHALL file an Answer to Plaintiffs' Complaint no later than **Monday, July 18, 2016**, as provided in Fed. R. Civ. P. 12(a)(4)(A).  It is further

ORDERED AND ADJUDGED that discovery may proceed with respect to all Defendants in this action.

---

[2] The Court need not address Defendants' remaining arguments, as these arguments pertain to Counts III through VI of Plaintiffs' SAC, which Plaintiffs voluntarily dismissed on June 13, 2016.  D.E. 114.

DONE AND ORDERED in Chambers at Miami, Florida, this 30th day of June, 2016.

*[signature: Ursula Ungaro]*

URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided: counsel of record